| | | |
|---|---|---|
| SANDOR DEMKOVICH, | ) | |
| | ) | |
| Plaintiff, | ) | No. 1:16-cv-11576 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| ST. ANDREW THE APOSTLE PARISH, | ) | |
| CALUMET CITY; and, | ) | |
| THE ARCHDIOCESE OF CHICAGO, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Sandor Demkovich brings this suit against St. Andrew the Apostle Parish in Calumet City, Illinois, and the Archdiocese of Chicago. He alleges employment discrimination based on: (1) sex, sexual orientation, and marital status under Title VII, 42 U.S.C. § 2000e *et seq.*; the Illinois Human Rights Act, 775 ILCS 5/2-101 *et seq.*; and the Cook County Human Rights Ordinance, Cook County, Ill., Code of Ordinances § 42-30 *et seq.*; and (2) disability under the Americans with Disabilities Act, 42 U.S.C. § 12112 *et seq.*, and the Illinois Human Rights Act, 755 ILCS 5/1-102 *et seq.*[1] R. 16, Am. Compl. ¶ 1.[2] In the original complaint, Demkovich alleged that Reverend Jacek Dada, pastor of St. Andrew Parish, fired

---

[1] This Court has subject matter jurisdiction over Demkovich's federal claims under 28 U.S.C. § 1331 and 42 U.S.C. § 2000e-5(f)(3), and supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367(a). The defense argument on the "ministerial exception" is an affirmative defense, not an argument for lack of subject matter jurisdiction. *See Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 195 n.4 (2012).

[2] Citations to the record are noted as "R." followed by the docket number and the page or paragraph number.

Demkovich because he entered into a same-sex marriage and because of his disabilities (diabetes and a metabolic syndrome). R. 1, Compl. ¶¶ 41, 51, 63, 77, 89.

In September 2017, the Court dismissed the complaint (though without prejudice) on the grounds that the discrimination and wrongful-termination claims were barred by the First Amendment's "ministerial exception." R. 15, Opinion (Sept. 29, 2017). Demkovich then filed an amended complaint, alleging much of the same discriminatory conduct, but modifying his claims to challenge the *hostile work environment*, rather than the firing itself. Am Compl. at 9-15. In contrast to the original complaint, which sought relief arising from the firing,[3] he now seeks damages caused by the emotional distress, mental anguish, and physical ailments he allegedly suffered from the hostile work environment. *Id.* The Amended Complaint thus does not seek relief for any adverse *tangible* employment action, but rather for the damages caused by the alleged discriminatory insults and remarks. The Archdiocese (for convenience's sake, this Opinion will collectively refer to the two Defendants that way) now moves to dismiss the Amended Complaint, again arguing that the ministerial exception bars the claims. R. 21, Defs.' Supp. Mot. Dismiss. For the reasons discussed below, the Court first holds that the ministerial exception does not categorically bar hostile work environment claims that do not seek relief for a tangible employment action. Instead, those types of claims (like the one presented here) must be evaluated on a case-by-case basis for excessive intrusion on the religious institution's First Amendment rights. Based on that analysis, the

_____

[3]He originally sought reinstatement, back pay, front pay, fringe benefits, compensatory damages, and punitive damages, all arising from the firing. Compl. at 7-14.

Archdiocese's motion is granted on the claims based on sex, sexual orientation, and marital status, but denied on the disability claims.

## I. Background

For the purposes of this motion, the Court accepts as true the allegations in the Amended Complaint. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). Demkovich worked as the "Music Director, Choir Director and Organist" for the Archdiocese of Chicago and St. Andrew Parish in Calumet City from September 2012 until his firing in September 2014. Am. Compl. ¶¶ 8-9. Demkovich's immediate supervisor was Reverend Jacek Dada, who was St. Andrew's pastor. *Id.* ¶¶ 10-11.

Reverend Dada knew that Demkovich was gay and that he was engaged to another man. Am. Compl. ¶ 13. During Demkovich's two years of employment at St. Andrew, Dada made remarks that reflected animus based on Demkovich's sex and sexual orientation, including calling Demkovich and his partner "bitches." *Id.* ¶¶ 15-16.[4] In July 2013, Dada asked Demkovich when he planned to marry his partner, and Demkovich responded that the wedding would be sometime in 2014. ¶ 17. Demkovich alleges that the abusive and harassing behavior became increasingly hostile as the wedding date approached. *Id.* ¶ 18. Dada repeatedly confronted and harassed other St. Andrew's staff members, parish members, and cantor and choir members, both in person and on the phone, demanding information about Demkovich's upcoming

---

[4]The Amended Complaint also lists instances of abusive and harassing behavior committed by Reverend Dada and other St. Andrew's staff members based on female staff members' sex, and African-American and Mexican-American community members' national origin or race. Am. Compl. ¶ 14. Those allegations do not directly bear on Demkovich's specific claims.

wedding ceremony. *Id.* ¶¶ 19, 23. Dada also recruited other St. Andrew's staff members to help him gather information about the wedding. *Id.* ¶ 20. The individuals that were harassed or contacted about Demkovich's wedding told Demkovich what Dada was doing and reported that Dada's behavior was distressing and causing them anxiety. *Id.* ¶ 24. Dada allegedly referred to Demkovich's wedding as a "fag wedding." *Id.* ¶ 22.

Demkovich married his partner in September 2014. Am. Compl. ¶ 27. In the forty-eight hours before the wedding, a St. Andrew's employee told Demkovich that Reverend Dada intended to ask for Demkovich's resignation because of the marriage. *Id.* ¶ 25. Another employee told Demkovich that Reverend Dada had informed his staff that he had already fired Demkovich. *Id.* ¶ 26. After the wedding, Dada demanded that another staff member sign a statement swearing she attended Demkovich's wedding, and when she declined to sign it, Dada told her that he had already fired Demkovich. *Id.* ¶¶ 28-30. Four days after the wedding, Reverend Dada asked Demkovich to resign because of the marriage. Am. Compl. ¶¶ 31-32. When Demkovich refused to resign, Dada fired him and said, "Your union is against the teachings of the Catholic church." *Id.* ¶ 33.

On the disability-discrimination claims, Demkovich alleges that he was frequently harassed because of his diabetes and a metabolic syndrome. Am. Compl. ¶¶ 34-35. Reverend Dada made harassing remarks about Demkovich's weight, often urging him to walk Dada's dog to lose weight, and telling Demkovich that he needed to lose weight because Dada did not want to preach at his funeral. *Id.* ¶¶ 35-36. Dada

also repeatedly complained about the cost of keeping Demkovich on the parish's health and dental insurance plans because of his weight and diabetes. *Id.* ¶ 37. In 2012, when Demkovich declined a dinner invitation from Dada because he did not have his insulin with him, Dada asked if Demkovich was diabetic and told him that he needed to "get his weight under control" to help eliminate his need for insulin. *Id.* ¶ 38.

As discussed earlier, the original complaint sought relief for Demkovich's *firing*. Compl. ¶¶ 41, 51, 63, 77, 89. The Court granted the Archdiocese's motion to dismiss, agreeing that the ministerial exception barred Demkovich's claims, but allowed Demkovich to amend his complaint. R. 15, Opinion at 2, 15 (citing Fed. R. Civ. P. 15(a)). Demkovich then filed this Amended Complaint, this time alleging claims of discrimination based on a hostile work environment. Am. Compl. ¶¶ 51, 62, 73, 86, 99. The Archdiocese moves to dismiss, again invoking the ministerial exception. Defs.' Suppl. Mot. Dismiss.

## II. Legal Standard

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This short and plain statement must "give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). The Seventh Circuit has explained that this rule "reflects a liberal notice pleading regime, which is intended to 'focus litigation on the merits of a claim' rather than on technicalities that might keep

plaintiffs out of court." *Brooks v. Ross*, 578 F.3d 574, 580 (7th Cir. 2009) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002)).

"A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). These allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Factual allegations—as opposed to mere legal conclusions—are entitled to the assumption of truth. *Iqbal*, 556 U.S. at 678-79.

As explained in the prior Opinion, the ministerial exception is actually an affirmative defense, *see Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 195 n.4 (2012), and is neither an exception to subject matter jurisdiction nor an issue of the adequacy of the claim. R. 15, Opinion at 4. The Court has already held that Demkovich is a "minister" for purposes of the exception. *Id.* at 7, 11. He does not now dispute his status as a minister, but rather contends that the exception does not apply to his hostile work environment claims, which seek relief only for harassment that did not result in a tangible employment action. *See* R. 23, Pl.'s Resp. Br. at 2.

### III. Analysis

### A. Scope of the Ministerial Exception

In light of Demkovich's concession (for purposes of this dismissal motion) that he is a "minister" under the ministerial exception, the primary question is whether the ministerial exception bars claims for a *hostile work environment*—rather than for refusals-to-hire or for firings—under Title VII and the ADA. Put even more precisely, Demkovich is *not* seeking damages arising out of a tangible employment action (like the firing). Instead, he seeks damages for the hostile work environment created by the alleged discriminatory remarks and insults of Reverend Dada. The Supreme Court's most thorough (and recent) case on the ministerial exception does not directly answer whether the exception applies to a hostile-environment claim that is limited to the harassment itself, rather than a tangible employment action. Instead, the case involved a claim for wrongful *termination. Hosanna-Tabor*, 565 U.S. at 188, 196 (applying ministerial exception to a disability-discrimination claim for wrongful termination). Having said that, *Hosanna-Tabor* might contain a clue about the exception's applicability to harassment claims. In describing the purpose of the ministerial exception, the Supreme Court explained that the exception "ensures that the authority to *select and control who will minister* to the faithful—a matter strictly ecclesiastical—is the church's alone." *Id.* at 194-95 (emphasis added) (cleaned up).[5] That description of the exception's purpose focuses on the church's exclusive

---

[5]This opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 JOURNAL OF APPELLATE PRACTICE AND PROCESS 143 (2017).

authority to choose who will be its ministers. Under that reasoning, hiring and firing decisions cannot be challenged by ministers. But scrutinizing only whether a church has *harassed* one of its ministers, without inquiring into any tangible employment action, does not necessarily undermine the purpose of the exception, at least as described in *Hosanna-Tabor*. Still, *Hosanna-Tabor* presented the Supreme Court only with the question of a minister's firing, so that case cannot be taken as directly deciding the issue. It is time to examine appellate court authority for an answer.

### 1. Seventh Circuit

The Archdiocese contends that in *Alicea-Hernandez v. Catholic Bishop of Chicago*, 320 F.3d 698, 703 (7th Cir. 2003), the Seventh Circuit held that *any* claim brought by a minister against a church is barred by the ministerial exception. Def.'s Suppl. Mot. Dismiss at 2, 7. That is an overbroad reading of the opinion.[6] It is true that, on first glance and taken out of context, there is a sentence in the opinion that could be read in that sweeping way: "The 'ministerial exception' applies without regard to the type of claims being brought." *Alicea-Hernandez*, 320 F.3d at 703. But the context of this sentence makes all the difference. First, it is not at all clear that the employee in the case even presented a hostile-environment claim at all, let alone a hostile-environment claim independent of a tangible employment action. The

_____

[6]Although *Alicea-Hernandez* does not apply as broadly as the Archdiocese contends, it is worth noting that Demkovich offers a meritless basis for distinguishing it. Specifically, Demkovich argues that *Alicea-Herndandez* does not apply because it characterized the ministerial exception as a problem with subject matter jurisdiction, rather than an affirmative defense. Pl.'s Resp. Br. at 10. True, the opinion used the wrong label for the exception, but that label had no effect on the opinion's reasoning and its application of the exception. The remainder of *Alicea-Hernandez* remains intact.

complaint was brought *pro se*, and as quoted by the Seventh Circuit, the employee alleged:

> I was subjected to prolonged humiliation and emotional stress of working under *unequal and unfair conditions of employment*; was excluded from management meetings, training and information required for me to perform my duties; was ordered evicted from the premises and replaced by a male Hispanic with less competence and experience in Hispanic communication.

320 F.3d at 702 (emphasis added).[7] Alicea-Hernandez's complaint thus sought damages for various tangible employment actions, including conditions that prevented her from performing her job, rather than damages arising from racist or sexist remarks.[8] So the Seventh Circuit was not presented with the sort of claim advanced by Demkovich: a hostile-environment claim that does *not* complain of a tangible employment action.[9]

There is another reason to reject the idea that *Alicea-Hernandez* was addressing intangible hostile-environment claims when the opinion stated that the ministerial exception "applies without regard to the type of claims being brought."

---

[7]*See also id.* at 700 ("She bases these claims on allegations of poor office conditions, the Church's attempts to prevent her from rectifying those conditions, exclusion from management meetings and communications, denial of resources necessary for her to perform her job, and constructive discharge and subsequent replacement by a less qualified male who received a higher salary and a more significant title for the same position.").

[8]It is true that the district court opinion stated that the employee complained she was "harassed," 2002 WL 598517, at *1 (N.D. Ill. Apr. 18, 2002), but there is no further description of the complaint's allegations of the misconduct in the opinion, because the district court concluded that she was complaining about the Church's policies (the Seventh Circuit later disagreed with that characterization of the complaint, 320 F.3d at 702).

[9]To be sure, another court and at least one scholar have read *Alicea-Hernandez* just as broadly as the Archdiocese does here. *See, e.g., Skrzypczak v. Roman Catholic Diocese of Tulsa*, 611 F.3d 1238, 1245 (10th Cir. 2010); Rosalie Berger Levinson, *Gender Equality vs. Religious Autonomy: Suing Religious Employers for Sexual Harassment After Hosanna-Tabor*, 11 STAN. J. CIV. RTS. & CIV. LIBERTIES 89, 95 (2015). But this Court disagrees, as detailed in the text.

320 F.3d at 703. That statement was made specifically in response to the employee's argument that the applicability of the ministerial exception depends on "the nature of her claims and whether the discrimination in question was exclusively secular." *Id.* The opinion goes on to respond, "Here she is mistaken. The 'ministerial exception' applies without regard to the type of claims being brought." *Id.* The crucial point comes next: to explain the rejection of the argument, the Seventh Circuit relied on and quoted from a Fourth Circuit decision, *E.E.O.C. v. Roman Catholic Diocese of Raleigh, N.C.*, 213 F.3d 795, 802 (4th Cir. 2000). Its reliance on that case demonstrates that the Seventh Circuit was only rejecting the employee's argument that courts must examine whether the employer is advancing a secular or a religious *motive* for the employment decision. Specifically, *Alicea-Hernandez* quoted, in pertinent part:

> The exception precludes any inquiry whatsoever into the reasons behind a church's ministerial employment decision. The church need not, for example, proffer any religious justification for its decision, for the Free Exercise Clause protects the act of a decision rather than the motivation behind it.

*Alicea-Hernandez*, 320 F.3d at 703 (cleaned up) (quoting *Roman Catholic Diocese*, 213 F.3d at 802). The Fourth Circuit decision too did not address whether the ministerial exception applies to non-tangible hostile-environment claims. *See Roman Catholic Diocese*, 213 F.3d at 798, 802. So when the Seventh Circuit stated, immediately following the quote of the Fourth Circuit decision, that to "rule otherwise would enmesh the court in endless inquiries as to whether each discriminatory act was based in Church doctrine or simply secular animus," 320 F.3d at 703, the meaning of the prior pronouncement is clear: the ministerial exception applies "without regard

to the type of claims" means that the exception applies even if the employee claims that the discrimination was motivated by a secular reason, rather than a religious doctrine. That holding accurately predicted *Hosanna-Tabor*, 565 U.S. at 188-89 (a church cannot be made "to accept or retain an unwanted minister," no matter the reason), but the holding does not go so far as to address a discrimination claim that does *not* target whether a minister is selected or retained.

## 2. Claims that Do Not Challenge a Tangible Employment Action

So the question of whether the ministerial exception applies to claims that do not challenge a tangible employment action remains open in this Circuit. To figure out whether the exception applies to those sorts of claims, it would help to examine the two extremes of discrimination claims brought by employees against their religious employers, because the principles and rationale for the two extremes will provide guidance on the right answer. On one end of the spectrum, as noted earlier, the Supreme Court has made clear that the selection or retention of a minister is completely off-limits to the courts. *Hosanna-Tabor*, 565 U.S. at 194-96. The choice of *who* will minister to the congregation is absolutely protected by the First Amendment. *Id.* at 194-95. But the Supreme Court did not decide, as also discussed earlier, whether the exception applies outside a challenge to a minister's selection or retention. *Id.* at 196 ("The case before us is an employment discrimination suit brought on behalf of a minister, challenging her church's decision to fire her. Today we hold only that the ministerial exception bars such a suit. We express no view on

whether the exception bars other types of suits, including actions by employees alleging breach of contract or tortious conduct by their religious employers.").

Inching away now from the extreme of selection and retention of ministers, other *tangible* employment actions taken against ministers should also be covered by the ministerial exception. Although the Supreme Court has not weighed in on that issue, other federal courts have adopted that principle. *See, e.g.*, *Young v. N. Illinois Conference of United Methodist Church*, 21 F.3d 184, 184, 187 (7th Cir. 1994) (minister's claims for denial of promotion, as well as termination, was barred); *see also Gellington v. Christian Methodist Episcopal Church, Inc.*, 203 F.3d 1299, 1301, 1304 (11th Cir. 2000) (minister's retaliation and constructive discharge claims, based on reassignment to a church 800 miles away with a substantially reduced salary, were barred by ministerial exception); *E.E.O.C. v. Catholic Univ. of Am.*, 83 F.3d 455, 457 (D.C. Cir. 1996) (minister's claim for denial of tenure at the Catholic University of America was barred); *Rayburn v. Gen. Conf. of Seventh-Day Adventists*, 772 F.2d 1164, 1164-65, 1171 (4th Cir. 1985) (minister's claim for denial of pastoral position was barred); *McClure v. Salvation Army*, 460 F.2d 553, 559 (5th Cir. 1972) (claims for "the determination of a minister's salary, his place of assignment, and the duty he is to perform in the furtherance of the religious mission of the church" were barred).

The extension of the ministerial exception to claims that challenge *tangible* employment actions is consistent with the exception's underlying rationale. Those claims, although not directly challenging a selection or retention of a minister, still intrude on a church's internal governance of its minister's employment duties. *See*

*Alicea-Hernandez*, 320 F.3d at 703 ("[A]n investigation and review of such matters of church administration and government as a minister's salary, his place of assignment and his duty, which involve a person at the heart of any religious organization, could only produce by its coercive effect the very opposite of that separation of church and State contemplated by the First Amendment.") (quoting *McClure*, 460 F.2d at 560). Tangible employment actions are, by definition, directly related to the church's authority as the employer of the minister. *See Burlington Indus. v. Ellerth*, 524 U.S. 742, 761-62 (1998) (defining tangible employment actions as "a *significant change in employment status*, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits") (emphasis added). As *Ellerth* explained, "[t]angible employment actions are the means by which the supervisor brings the official power of the enterprise to bear on subordinates. A tangible employment decision requires an official act of the enterprise, a company act." *Id.* at 762. So when a tangible employment action is challenged by a minister, the minister is asking a court to directly regulate the minister's *employment status*, which steps directly on the church's governance of the minister *as a minister*. The ministerial exception applies to claims that challenge a tangible employment action.

On the other end of the spectrum, no First Amendment problem arises when a lay employee (that is, a non-minister) of a religious employer brings an employment claim that is unrelated to any religious belief or doctrine. *See, e.g.*, *DeMarco v. Holy Cross High Sch.*, 4 F.3d 166, 171-72 (2d Cir. 1993) (lay teacher's Age Discrimination

in Employment Act (ADEA) claim for failure to renew his contract could proceed because the claim did not implicate the religious employer's beliefs or purpose); *E.E.O.C. v. Mississippi Coll.*, 626 F.2d 477, 479-80, 485-86 (5th Cir. 1980) (sex and race discrimination claims brought by lay employee against religious-college employer were not barred by the First Amendment because they did not implicate any religious beliefs); *Morgan v. Cent. Baptist Church of Oak Ridge*, 2013 WL 12043468, at *19-20 (E.D. Tenn. Dec. 5, 2013) (allowing lay employee's sexual harassment and hostile work environment claims to proceed); *Longo v. Regis Jesuit High Sch. Corp.*, 2006 WL 197336, at *5-7 (D. Colo. Jan. 25, 2006) (holding that the non-minister's ADA claims were not barred by the Establishment Clause because the employment decision did not arise from application of religious doctrine); *Smith v. Raleigh Dist. of N. Carolina Conference of United Methodist Church*, 63 F. Supp. 2d 694, 712, 714, 717 (E.D.N.C. 1999) (allowing lay employee's sexual harassment and hostile work environment claims to proceed, as "plaintiffs' claims present[ed] secular, rather than ecclesiastical disputes" that could be resolved "by reference to neutral principles of law" and did not require the court to choose "among competing religious visions"); *Guinan v. Roman Catholic Archdiocese of Indianapolis*, 42 F. Supp. 2d 849, 850, 853 (S.D. Ind. 1998) (allowing lay teacher's ADEA claim for failing to renew her contract because the claim did not burden the church-employer's religious rights). But when the religious employer offers a religious justification for the challenged conduct, then—generally speaking—the First Amendment protects against the claim, so long as the employer proves that the religious motive is the *actual* motive. *See, e.g.,*

*DeMarco*, 4 F.3d at 170-71; *Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648, 657-59 (10th Cir. 2002) (neither ministerial employee nor her lay partner could sustain sexual harassment claims against church for remarks made about gays, because the remarks were made as part of ecclesiastical discussions on church policy toward gays). Unlike the ministerial exception, however, whether the employer acted on a religious-based motive *is* examined for challenges brought by non-minister employees.

The final point is that there are limits to an employer's invocation of a religious motive for challenged conduct as to non-minister employees. In some situations, even when a religious institution proves that there is a religious motive for the violation of a generally applicable law, a balancing of interests might remove the conduct from First Amendment protection (such as commission of a crime). *See, e.g., Tomic v. Catholic Diocese of Peoria*, 442 F.3d 1036, 1039-40 (7th Cir. 2006) (noting that the "internal-affairs exception [to employment laws] is limited," for instance, "[a] church could not subject its clergy to corporal punishment or require them to commit criminal acts"); *Dole v. Shenandoah Baptist Church*, 899 F.2d 1399, 1392 (4th Cir. 1990) (rejecting religious school's argument that the Fair Labor Standards Act (FLSA) violated a religious belief, because the burden on religion would be limited and no entanglement would arise from enforcing the FLSA); *see also Employment Div., Dep't of Human Res. of Oregon v. Smith*, 494 U.S. 872, 877-78 (1990) (individuals must abide a valid or neutral law of general applicability even if it proscribes or requires conduct that is contrary to his religious practice as long as the law does not

violate other constitutional protections). So it is possible that a court may require that, in a case brought by a non-minister, a religious employer comply with a valid or neutral law of general applicability that may burden its religion in certain circumstances.

## B. Hostile Work Environment Claims

Where, then, should a minister's challenge to a hostile work environment, with no challenge to a tangible employment action, fall on this spectrum? In the hostile-environment case under Title VII, the employee must allege that: "(1) [the employee] was subject to unwelcome harassment; (2) the harassment was based on … national origin or religion (or another reason forbidden by Title VII); (3) the harassment was severe or pervasive so as to alter the conditions of employment and create a hostile or abusive working environment; and (4) there is basis for employer liability." *Huri v. Office of the Chief Judge of the Circuit Court of Cook Cty.*, 804 F.3d 826, 833-34 (7th Cir. 2015). Although an employer is strictly liable for harassment that results in a tangible employment action, *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 760-61 (1998), when no tangible action is taken, or when an employee is barred from raising claims as to those tangible actions (as by the ministerial exception), then the employer can raise an affirmative defense, *Elvig v. Calvin Presbyterian Church*, 375 F.3d 951, 962 (9th Cir. 2004) (collecting cases). The affirmative defense comprises two elements: "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee

unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Ellerth*, 524 U.S. at 765.

Only two courts of appeals have addressed whether hostile work environment claims brought by a minister are barred by the ministerial exception.[10] The courts have come to opposite conclusions. The Tenth Circuit addressed a minister's claims under Title VII for gender discrimination, disparate impact based on gender, and—importantly—hostile work environment, among other claims. *Skrzypczak v. Roman Catholic Diocese of Tulsa*, 611 F.3d 1238, 1240-41 (10th Cir. 2010) (emphasis added). *Skrzypczak* held that "a hostile work environment claim brought by a minister … implicate[s] a church's spiritual functions, … involv[ing] gross substantive and procedural entanglement with the Church's core functions, its polity, and its autonomy." *Id.* at 1245 (cleaned up). But the Tenth Circuit relied in large part on the same overbroad interpretation of *Alicea-Hernandez* as the Archdiocese proposed in this case. As explained earlier in this Opinion, *Alicea-Hernandez* did not address hostile-environment claims that do not challenge a tangible employment action.

---

[10]The parties both cite several district and state court decisions that also come to opposite conclusions about whether the ministerial exception bars sexual harassment claims. *Compare* Def.'s Supp. Mot. Dismiss at 6-7 (citing *Preece v. Covenant Presbyterian Church*, 2015 WL 1826231, *7 (D. Neb. Apr. 22, 2015) (plaintiff's sexual harassment claim is factually entwined with plaintiff's other employment claims and is thus barred); *Ogugua v. Archdiocese of Omaha*, 2008 WL 4717121 (D. Neb. Oct. 22, 2008); *Gomez v. Evangelical Luther. Church in Am.*, 2008 WL 3202925 (M.D. N.C. Aug. 7, 2008)) *with* Pl.'s Resp. Br. at 7 n.2 (citing *Nigrelli v. Catholic Bishop*, 1991 WL 36712 at *4 (N.D. Ill. 1991) (holding that "in order to determine if the plaintiff was sexually harassed, the court need not inquire into the doctrines and religious goals of the Catholic Church … ."); *Dolquist v. Heartland Presbytery*, 342 F. Supp. 2d 996, 1002 (D. Kan. 2004) (holding the ministerial exception did not bar sexual harassment claim, but this decision was decided before *Skrzypczak*, 611 F.3d 1238, which holds the opposite and is controlling in the Tenth Circuit); *Black v. Snyder*, 471 N.W.2d 715, 721 (Minn. Ct. App. 1991) (holding the same). But those opinions are not binding so the Court will engage in its own analysis.

On the other side of the split are two Ninth Circuit cases. In both cases, ministerial employees alleged that they suffered sexual harassment in violation of Title VII. *Elvig v. Calvin Presbyterian Church*, 375 F.3d 951, 956 (9th Cir. 2004); *Bollard v. California Province of the Soc'y of Jesus*, 196 F.3d 940, 944 (9th Cir. 1999). In *Elvig*, an associate pastor alleged that, among other things, the pastor sexually harassed her. 375 F.3d at 953-54. When the associate pastor made a formal complaint to the church, no action was taken to stop the harassment, and the pastor relieved her of certain duties, verbally abused her, and engaged in intimidating behavior. *Id.* In *Bollard*, the plaintiff was a novice of the Jesuit order, and he alleged sexual harassment (among other things) based on the conduct of his superiors, who "sent him pornographic material, made unwelcome sexual advances, and engaged him in inappropriate and unwelcome sexual discussions." 196 F.3d at 944. The novice reported the harassment to his superiors, but no corrective action was taken. *Id.*

In both cases, the Ninth Circuit engaged in an analysis under the Free Exercise Clause and the Establishment Clause of the First Amendment.[11] What the analyses show is that when a minister brings a claim that does not challenge a tangible employment action, then whether the First Amendment bars the claim depends on a *case-by-case* analysis on the nature of the claim, the extent of the intrusion on religious doctrine, and the extent of the entanglement with church governance required by the particular litigation. If the nature of the claim would require that a

---

[11]In *Elvig*, the court did not explicitly differentiate between the Free Exercise Clause and the Establishment Clause in its analysis. It employed considerations from each, however, and explicitly relied on *Bollard*, which, as discussed in the text, analyzed the novice's sexual harassment claim under each Clause.

court take a stance on a disputed religious doctrine, then that weighs in favor of First Amendment protection for the church. As *Elvig* reasoned, the Free Exercise Clause prevents courts from "deciding among competing interpretations of church doctrine, or other matters of an essentially ecclesiastical nature, … [meaning] a church must retain unfettered freedom in its choice of ministers because ministers represent the church to the people. Indeed, the ministerial relationship lies so close to the heart of the church that it would offend the Free Exercise Clause simply to require the church to articulate a religious justification for its personnel decisions." *Elvig*, 375 F.3d at 956 (cleaned up).

If, on the other hand, no religious justification is offered at all (for a non-tangible employment action), then there would be little or no risk of violating the Free Exercise Clause. Indeed, in *Bollard*, the religious order allegedly stated that it actually wanted the novice to *remain* a member of the order, and the order disavowed harassment (as opposed to endorsing it). 196 F.3d at 947. In *Elvig*, the church denied that the harassment occurred at all. 375 F.3d at 963. In the Ninth Circuit's view, the lawsuits thus presented only a narrow secular inquiry. *Elvig*, 375 F.3d at 963-64; *Bollard*, 196 F.3d at 947-48. The Free Exercise Clause did not bar either sexual harassment suit.

Moving on to the Establishment Clause, the Ninth Circuit again concluded that no excessive entanglement would arise from the lawsuits. Courts employ a three-part test to determine whether a statute violates the Establishment Clause: "First, the statute must have a secular legislative purpose; second, its principal or primary

effect must be one that neither advances nor inhibits religion; finally, the statute must not foster an excessive government entanglement with religion." *Lemon v. Kurtzman,* 403 U.S. 602, 612-13 (1971) (cleaned up). Because Title VII has a secular purpose and its principal effect neither advances nor inhibits religion, the only element at issue is whether applying Title VII to a minister's claim of sexual harassment (without challenging a tangible employment action) would foster an impermissible government entanglement with religion. *Bollard*, 196 F.3d at 948 (citing *E.E.O.C. v. Pac. Press Pub. Ass'n*, 676 F.2d 1272, 1280-81 (9th Cir. 1982)). If a harassment claim does not challenge the retention of a minister, then (generally speaking) no *substantive* entanglement problem would arise.[12] *Bollard*, 196 F.3d at 949. Courts still must remain wary of potential *procedural* entanglement, because it may be "the very process of inquiry" by the court that may "impinge on rights guaranteed by the Religion Clauses." *Id.* (quoting *N.L.R.B. v. Catholic Bishop of Chicago*, 440 U.S. 490, 502 (1979)). Litigation-procedure entanglement could arise from the length of the proceeding; the involvement of state agencies, the EEOC, and federal courts; the application of tools of discovery to church personnel and records; the remedies that would be imposed; and most importantly, "the potential for

---

[12]It is not clear that the Supreme Court would divide the entanglement inquiry into "substantive" and "procedural" entanglement. But whatever the label, the considerations are the same. *See, e.g.*, *Agostini v. Felton*, 521 U.S. 203, 232 (1997) ("To assess entanglement, we have looked to the character and purposes of the institutions that are benefited, the nature of the aid that the State provides, and the resulting relationship between the government and religious authority.") (cleaned up); *N.L.R.B. v. Catholic Bishop of Chicago*, 440 U.S. at 502 ("It is not only the conclusions [about religious motivations behind certain decisions] that may be reached by the Board which may impinge on rights guaranteed by the Religion Clauses, but also the very process of the inquiry leading to findings and conclusions.").

protracted government surveillance of church activities." *Bollard*, 196 F.3d at 949 (cleaned up). The Ninth Circuit ultimately concluded that neither case presented excessive entanglement in light of the secular focus of the claims and the absence of any attempt to obtain any directly employment-related remedy like lost pay. *Id.* at 949-50; *Elvig*, 375 F.3d at 963, 966-68.

The upshot of these cases, as well as the many cases in which non-minister employees successfully bring claims so long as there is no excessive entanglement, is that federal courts have been able to evaluate, on a case-by-case basis, when an employee's particular case would pose too much of an intrusion into the religious employer's Free Exercise and Establishment Clause rights. If a minister's hostile-environment claim does not challenge a tangible employment action and does not pose excessive entanglement with the religious employer, then the ministerial exception should not apply. In that setting, the hostile-environment claim "is no greater than that attendant on any other civil suit a private litigant might pursue against a church." *Bollard*, 196 F.3d at 950; *Elvig*, 375 F.3d at 968. To be sure, the fact that a *minister*, rather than a lay employee, is bringing the claim is relevant to deciding whether the lawsuit poses too great a danger of excessive entanglement. But there is no categorical bar to that narrow category of claims brought by ministers.

### C. Sex, Sexual Orientation, and Marital Status

Although the ministerial exception does not bar Demkovich's hostile-environment claims (to repeat, he does not challenge a tangible employment action), the Court concludes that litigation over Reverend Dada's alleged harassment based

on Demkovich's sex, sexual orientation, and marital status would excessively entangle the government in religion. To start, the Archdiocese offers a religious justification for the alleged derogatory remarks and other harassment: they "reflect the pastor's opposition, in accord with Catholic doctrine, to same sex marriage." Def.'s Reply Br. at 5. Whether Catholicism in fact dictates opposition to same-sex marriage is *not* subject to court scrutiny. "[O]nce the court has satisfied itself that the authorized religious body has resolved the issue, the court may not question the resolution." *McCarthy v. Fuller*, 714 F.3d 971, 976 (7th Cir. 2013); *see also Serbian E. Orthodox Diocese for U.S. of Am. & Canada v. Milivojevich*, 426 U.S. 696, 718 (1976) (a court cannot evaluate conflicting testimony in the face of an official Church doctrine); *Grussgott v. Milwaukee Jewish Day Sch., Inc.*, 882 F.3d 655, 660 (7th Cir. 2018) (a court must defer to a religious organization's designation of what constitutes religious activity "where there is no sign of subterfuge"). The Catholic Church's official opposition to gay marriage is commonly known (nor does Demkovich question it), and there is no reason to question the sincerity of the Archdiocese's belief that the opposition is dictated by Church doctrine. This official opposition weighs as an excessive-entanglement concern in this case, because the harassing statements and conduct are motivated by an official Church position (or at least the Archdiocese would defend the case on those grounds). Of course, regulating *how* the official opposition is expressed is not as directly intrusive as outright punishing the Church for holding that position (which a federal court cannot do). But it comes close, and must weigh in favor of barring the claim under the Religion Clauses. *See Bryce*, 289

F.3d at 653, 659 (holding that church employee and her same-sex partner could not bring sexual harassment claims based on allegedly anti-gay statements made by reverend in letters and at church meetings because the church autonomy doctrine, rooted in the Free Exercise Clause and Establishment Clause, gives the church the right "to engage freely in ecclesiastical discussions"); *compare Bollard*, 196 F.3d at 947 (holding "the Free Exercise rationales supporting an exception to Title VII are missing. The [defendant religious employer] do[es] not offer a religious justification for the harassment Bollard alleges … ."); *see also Korte v. Sebelius*, 735 F.3d 654, 679 (7th Cir. 2013) ("[T]he Free Exercise Clause protects not just belief and profession but also religiously motivated conduct.").

The hostile-environment claims based on Demkovich's sex, sexual orientation, and marital status also pose other risks of impermissible entanglement with religion. First, Demkovich's status as a minister weighs in favor of more protection of the Church under the First Amendment. Remember that the Church has absolute say in who will be its ministers. *See Hosanna-Tabor*, 565 U.S. at 188-89. The Archdiocese might very well assert that it has a heightened interest in opposing same-sex marriage amongst those who fulfill ministerial roles. Either the Court would have to accept that proposition as true (thus intensifying the intrusion in regulating how the opposition is conveyed to the Church's ministers) or the parties would have to engage in intrusive discovery on the sincerity of that belief. Indeed, even if the proposition would be accepted as true, the Church itself would have a litigation interest in proving to the jury *why* there is a heightened interest in opposing same-sex marriage

amongst its ministers. That would put the Church in a position of having to *affirmatively* introduce evidence of its religious justification, so the litigation's intrusion would not be just a matter of *responding* to Demkovich's discovery requests. The Church might even wish to offer the views of its congregants on this issue, especially if Demkovich offered evidence from congregants that they would not be offended by a gay music director.

Second, it is easy to foresee how the opposition to same-sex marriage would be litigated in other ways throughout the case. For example, in order to prove that Reverend Dada made the derogatory remarks, Demkovich's attorney naturally would ask Dada about the *motive* to make the alleged remarks. Dada might even be put in a position to reveal whether he agrees with the official Church position, and even the *degree* with which he agrees (or disagrees) with it. No doubt too Demkovich's attorney would want to elicit concessions from Dada that if the remarks were proven to be made, then that would contravene the Church's guidance on how to (or how not to) express the official opposition to same-sex marriage.

Third, discovery over these claims would likely take a prolonged period. The issues described above would themselves consume plenty of time (and possibly subpoenas to congregants and expert testimony), and the Amended Complaint refers to other staff members and congregants. The allegations span a time period of more than one year, at least from July 2013 to September 2014. Am. Compl. ¶¶ 17, 31. So discovery would not be concentrated on a short time period. This factor too points in the direction of concluding that the entanglement with religion will be excessive.

Lastly, because the hostile-environment claim does not challenge a tangible employment action, the Archdiocese could seek to prove an affirmative defense, namely, that the Archdiocese took reasonable care to prevent or to correct harassment and that Demkovich failed to take advantage of the Archdiocese's preventive or corrective efforts. *Ellerth*, 524 U.S. at 765. That too will require an examination of the Church's employment practices, including on preventing sexual-orientation discrimination in particular. Again, Demkovich naturally would try to undermine the genuineness and efficacy of prevention-and-correction efforts on that particular kind of discrimination, raising the specter of intruding on the Archdiocese's religious-based opposition to same-sex marriage. All in all, there are too many circumstances—in this particular case for this particular set of claims—that would result in excessive entanglement with, and intrusion on, the Church's religious doctrine to allow the claims based on sex, sexual orientation, and marital status to move forward. Those claims are dismissed.

### D. Disability

Moving on to the disability claim, the Court first notes that the Seventh Circuit has not yet expressly decided that the ADA ever permits a hostile work environment claim. Instead, the Seventh Circuit has assumed—in both published and unpublished decisions—that there is such a claim under the ADA. *See, e.g., Shott v. Rush Univ. Med. Ctr.*, 652 Fed.Appx. 455, 458 (7th Cir. 2016); *Lloyd v. Swifty Transp., Inc.*, 552 F.3d 594, 603 (7th Cir. 2009); *Mannie v. Potter*, 394 F.3d 977, 982 (7th Cir. 2005).[13]

---

[13]Many circuits have affirmatively recognized hostile work environment claims under the ADA, and the circuits that have not explicitly recognized such claims have assumed they

In light of the similarity between Title VII and the ADA in protection against discriminatory workplace conditions, this Court too assumes that the ADA does provide for hostile work environment claims. When analyzing hostile work environment claims under the ADA, the Seventh Circuit has "assumed that the standards for proving such a claim would mirror those established for claims of hostile work environment under Title VII." *Mannie*, 394 F.3d at 982 (citations omitted).

Here, the Archdiocese offers no religious explanation for the alleged disability discrimination. The Archdiocese justifies the comments as "reflect[ing] the pastor's subjective views and/or evaluation of Plaintiff's fitness for his position as a minister." Def.'s Reply Br. at 5. But this is not a *religious* justification based on any Church doctrine or belief, at least as proffered so far by the defense. So the disability claim does not pose the same dangers to religious entanglement as the sex, sexual orientation, and marital-status claims. Nothing in discovery should impose on religious doctrine on this claim. Rather, the inquiry will make secular judgments on the nature and severity of the harassment (and whether it even happened), as well as what, if anything, the Archdiocese did to prevent or correct it.[14] The Religion Clauses do not bar Demkovich from pursing the hostile-environment claims based on disability.

---

are a viable theory of recovery when analyzing and rejecting those claims that do not survive summary judgment on other grounds. *Mashni v. Bd. of Educ. of City of Chicago*, 2017 WL 3838039, at *9 (N.D. Ill. Sept. 1, 2017) (collecting cases).

[14]If, during discovery, the Archdiocese believes Demkovich is intruding into protected religious territory, then the Archdiocese may raise the issue with this Court.

Finally, the Court rejects the Archdiocese's argument that the Amended Complaint fails to adequately state a claim for relief. Fed. R. Civ. P. 12(b)(6). Demkovich alleges that his supervisor, Dada, harassed him based on his disability in violation of the ADA and Illinois Human Rights Act. Am. Compl. ¶¶ 35-39, 41, 43, 82, 95. The Archdiocese contends that "the alleged conduct was not severe or pervasive, was not physically threatening, and … is not alleged to have altered the terms and conditions of Plaintiff's employment," so the claim must fail. Def.'s Suppl. Mot. Dismiss at 15. But it is important to remember this case is at the *pleading* stage, so Demkovich need not plead more facts than necessary to give the Archdiocese "fair notice of [his] claims and the grounds upon which those claims rest, and the details in [his] … Amended Complaint present a story that holds together." *Huri*, 804 F.3d at 834 (cleaned up).[15] Demkovich alleged multiple instances of harassing statements made to him by Dada about his medical condition and his disability, and the Amended Complaint alleges the effect on Demokovich as well: the alleged discrimination made him feel "discriminated against," made him feel "humiliated and belittled," "severely damaged [his] … personal and professional reputation" and caused his "physical and mental health [to] suffer[]." *See* Am. Compl. ¶¶ 43-44, 46-47; *id.* ¶ 35 (Dada repeatedly encouraged Demkovich to walk Dada's dog to get some exercise to lose weight); *id.*

---

[15]It is true that many courts, at the *summary judgment* stage, have dismissed hostile work environment claims based on a similar degree of evidence as alleged in the Amended Complaint here. In every case cited by the Archdiocese in support of its argument that Demkovich does not state a claim for a hostile work environment based on his disability, the court dismissed the case at the *summary judgment* stage. Def.'s Supp. Mot. Dismiss at 13, 15; Def.'s Reply Br. at 11-12, 12 n.3. At that stage, the Archdiocese may file a summary judgment motion, if discovery so justifies it.

¶ 36 (Dada would "tell Demkovich that he needed to lose weight because [Dada] didn't want to have to preach at Demkovich's funeral"); *id.* ¶ 37 (Dada told Demkovich several times that Demkovich's weight and diabetes made it cost prohibitive for the parish to include him on its health and dental insurance plans); *id.* ¶ 38 (on one instance in 2012, Dada told Demkovich he needed "to 'get his weight under control' to help eliminate Demkovich's need for insulin"); *id.* ¶ 39 (other parish employees were overweight or suffered from chronic health issues, but Demkovich alone suffered frequent and routine harassment because of it). At this pleading stage, Demkovich's allegations about the harassment are sufficient to state a hostile-environment claim. *See Huri*, 804 F.3d at 834 (holding "it is premature at the pleadings stage to conclude just how abusive [the plaintiff's] work environment was," and reversing the district court's dismissal of the plaintiff's hostile work environment claims because the alleged conduct, including "screaming, prayer circles, social shunning, [and] implicit criticism"—"could plausibly be abusive."); *see also Valdivia v. Twp. High Sch. Dist. 214*, 2017 WL 2114965, at *3 (N.D. Ill. May 15, 2017) (collecting in-district cases in which the courts denied motions to dismiss hostile work environment claims based on allegations of repeated and ongoing verbal harassment). So the hostile-environment claims are adequately pled.

## IV. Conclusion

For the reasons discussed, the Defendants' motion to dismiss is granted as to the claims based on sex, sexual orientation, and marital status, but denied as to the claims based on disability.

ENTERED:

_____s/Edmond E. Chang_____
Honorable Edmond E. Chang
United States District Judge

DATE: September 30, 2018