

CERTIFIED COPY
A True Copy
Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

In the

# United States Court of Appeals

### For the Seventh Circuit

———————————

No. 19-2142

SANDOR DEMKOVICH,

*Plaintiff-Appellee,*

*v.*

ST. ANDREW THE APOSTLE PARISH, CALUMET CITY, and THE
ARCHDIOCESE OF CHICAGO,

*Defendants-Appellants.*

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:16-cv-11576 — **Edmond E. Chang**, *Judge.*

———————————

ARGUED FEBRUARY 9, 2021 — DECIDED JULY 9, 2021

———————————

Before SYKES, *Chief Judge*, and FLAUM, EASTERBROOK,
KANNE, ROVNER, WOOD, HAMILTON, BRENNAN, ST. EVE, and
KIRSCH, *Circuit Judges*.[1]

BRENNAN, *Circuit Judge*. The ministerial exception,
grounded in the First Amendment's Religion Clauses,

———————————

[1] Circuit Judge Scudder did not participate in the consideration or
decision of this case.

protects religious organizations from employment discrimination suits brought by their ministers. The question here is whether this constitutional protection applies to hostile work environment claims based on minister-on-minister harassment. We hold that it does.

## I

St. Andrew the Apostle Parish in Calumet City, Illinois is a Roman Catholic church of the Archdiocese of Chicago.[2] In September 2012, the church hired Sandor Demkovich as its music director, choir director, and organist. Reverend Jacek Dada, a Catholic priest and the church's pastor, supervised Demkovich in these roles. Over the next two years, their relationship deteriorated, culminating in Demkovich's termination by Reverend Dada in September 2014. Demkovich alleges that Reverend Dada, who is not a defendant here, discriminated against him based largely on his sexual orientation and physical condition.

Demkovich is a gay man. According to Demkovich, Reverend Dada repeatedly subjected him to derogatory comments and demeaning epithets showing a discriminatory animus toward his sexual orientation. The frequency and hostility of these remarks increased after Reverend Dada learned that Demkovich planned to marry his partner while still employed by the church. After Demkovich's marriage in September 2014, Reverend Dada asked for his resignation and told him that his marriage was against the teachings of the

---

[2] On a motion to dismiss, we accept all well-pleaded facts from the amended complaint as true and view them in the light most favorable to the plaintiff. *White v. United Airlines, Inc.*, 987 F.3d 616, 620 (7th Cir. 2021).

Catholic Church. When Demkovich refused, Reverend Dada fired him.

Demkovich also suffers from diabetes, metabolic syndrome, and weight issues. Before Demkovich's termination, Reverend Dada allegedly made belittling and humiliating comments based on these conditions as well. Reverend Dada's remarks, by Demkovich's account, had no discernible connection with the terms of his employment and adversely affected his mental and physical health.

Eventually, Demkovich sued the church and the Archdiocese for employment discrimination. In his initial complaint, Demkovich claimed the church fired him based on his sex, sexual orientation, marital status, and disability. He alleged the church therefore violated Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e-2 *et seq.*, the Americans with Disabilities Act, 42 U.S.C. § 12112 *et seq.*, and analogous state and county laws. The church moved to dismiss Demkovich's case under Federal Rule of Civil Procedure 12(b)(6) and raised the ministerial exception as an affirmative defense to his claims. The district court deemed Demkovich a minister protected by the exception, granted the church's motion, and dismissed the complaint in full, albeit without prejudice.

In his amended complaint, Demkovich repackaged his allegations of discriminatory termination as hostile work environment claims. The church again moved to dismiss and invoked the ministerial exception a second time. The district court granted this motion in part, dismissing Demkovich's hostile work environment claims based on sex, sexual orientation, and marital status while allowing his disability-based hostile work environment claims to proceed. *Demkovich v. St.*

*Andrew the Apostle Par.*, 343 F. Supp. 3d 772, 776, 789 (N.D. Ill. 2018).[3]

The district court held that the ministerial exception did not categorically bar Demkovich's hostile work environment claims. *Id.* at 778–86. Protection under the ministerial exception instead turned on whether the plaintiff challenged a tangible or intangible employment action. *Id.* at 780. Claims based on tangible employment actions, such as termination, were categorically barred; claims based on intangible employment actions, such as discriminatory remarks and insults, were not. *Id.* at 778, 781–83. The district court reasoned that tangible employment actions implicated a minister's employment status, and therefore the religious organization's authority over that minister, in ways unlike intangible employment actions. *Id.* at 781–83. Because Demkovich alleged intangible employment actions in his amended complaint, the ministerial exception was not a "categorical bar" to his claims. *Id.* at 786. Rather, only concerns over excessive church-state entanglement—as when a religious organization proffers a religious justification for alleged conduct—could trigger the ministerial exception's protection against intangible employment action claims. *Id.* at 784–86. For the district court, application of the ministerial exception to intangible employment actions depended on a case-by-case balancing. *Id.*

This balancing led the district court to dismiss Demkovich's claims of a hostile work environment based on his sex, sexual orientation, and marital status. *Id.* at 786–87.

---

[3] In its second memorandum opinion and order, the district court held that Demkovich conceded his status as a minister. *Demkovich*, 343 F. Supp. 3d at 778.

No. 19-2142                                                    5

Several factors supported protecting the church. First, the church offered a religious justification for Reverend Dada's allegedly discriminatory remarks. *Id.* at 786. Second, Demkovich's status as a minister implicated the church's absolute right to choose its own ministers without civil interference. *Id.* at 786–87. And third, practical and procedural concerns, including the need to probe for animus and intrusive discovery, favored applying the ministerial exception. *Id.* at 787. The balance tipped the other way for Demkovich's disability-based hostile work environment claims, however. *Id.* at 787–88. The church offered no religious justification for these claims, so the district court did not see the same risks of excessive entanglement present in adjudicating the sex, sexual orientation, and marital status claims. *Id.* at 788. With only Demkovich's disability claims remaining, discovery began.

On the church's motion, the district court then certified a controlling question of law to this court under 28 U.S.C. § 1292(b):

> Under Title VII and the Americans with Disabilities Act, does the ministerial exception ban all claims of a hostile work environment brought by a plaintiff who qualifies as a minister, even if the claim does not challenge a tangible employment action?

A motions panel of this court accepted this interlocutory appeal. An appeal under § 1292(b) brings up the whole certified order. *United Airlines, Inc. v. Mesa Airlines, Inc.*, 219 F.3d 605, 609 (7th Cir. 2000); *see BP P.L.C. v. Mayor & City Council of Baltimore*, 141 S. Ct. 1532, 1539–40 (2021). We "may address any issue fairly included within the certified order because 'it is the *order* that is appealable, and not the controlling question identified by the district court.'" *Yamaha Motor Corp., U.S.A. v.*

*Calhoun*, 516 U.S. 199, 205 (1996) (quoting 9 J. MOORE & B. WARD, MOORE'S FEDERAL PRACTICE ¶ 110.25[1], p. 300 (2d ed. 1995)). A divided panel affirmed the district court's decision denying dismissal of Demkovich's disability-based hostile work environment claim, and reversed its dismissal of his sex, sexual orientation, and marital status claims. *Demkovich v. St. Andrew the Apostle Par.*, 973 F.3d 718 (7th Cir. 2020). We vacated the panel opinion and reheard this interlocutory appeal en banc. Our review is de novo. *Degroot v. Client Servs., Inc.*, 977 F.3d 656, 659 (7th Cir. 2020).

## II

### A

The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. CONST. amend. I. From the Establishment Clause and the Free Exercise Clause flows the ministerial exception, which "ensures that the authority to select and control who will minister to the faithful—a matter 'strictly ecclesiastical'—is the church's alone." *Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC*, 565 U.S. 171, 194–95 (2012) (quoting *Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in North America*, 344 U.S. 94, 119 (1952)). These Religion Clauses "often exert conflicting pressures." *Cutter v. Wilkinson*, 544 U.S. 709, 719 (2005). But when it comes to the ministerial exception, they work in unison toward the common goal of protecting the employment rights of religious organizations. *Our Lady of Guadalupe School v. Morrissey-Berru*, 140 S. Ct. 2049, 2060 (2020) ("Under this rule, courts are bound to stay out of employment disputes

involving those holding certain important positions with churches and other religious institutions.").

The interests implicated by the ministerial exception have a rich lineage. *See Our Lady of Guadalupe*, 140 S. Ct. at 2061–62 (describing British and early American law on ministers and religious education); *Hosanna-Tabor*, 565 U.S. at 182–85 (chronicling the "background" against which "the First Amendment was adopted"). Questions over the boundary between religious and civil authority have been present since the founding. *See generally* Michael McConnell, *The Origins and Historical Understanding of Free Exercise of Religion*, 103 HARV. L. REV. 1409, 1464–65 (1990) (explaining that religious organizations from the founding have been able "to define their own doctrine, membership, organization, and internal requirements without state interference"). Supreme Court precedent reflects repeated engagement with that boundary and teaches that avoidance, rather than intervention, should be a court's proper role when adjudicating disputes involving religious governance. *See, e.g.*, *Serbian E. Orthodox Diocese for United States and Canada v. Milivojevich*, 426 U.S. 696, 697–99, 724–25 (1976) (dispute over control of church property and appointment of bishops); *Kedroff*, 344 U.S. at 95–96, 120–21 (same); *Watson v. Jones*, 80 U.S. 679, 713–15, 727–29 (1872) (dispute over control of church property); *see also Hosanna-Tabor*, 565 U.S. at 185–87 (describing the holdings of these cases). By rejecting civil intrusion into the religious sphere, these decisions developed the doctrine of "church autonomy." *Our Lady of Guadalupe*, 140 S. Ct. at 2061. This well-established principle means what it says: churches must have "independence in matters of faith and doctrine and in closely linked matters of internal government." *Id.*

The ministerial exception follows naturally from the church autonomy doctrine. In *McClure v. Salvation Army*, a female employee of the Salvation Army—an "officer" within this religious charity organization—alleged sex discrimination in violation of Title VII. 460 F.2d 553, 555–56 (5th Cir. 1972). The Fifth Circuit held that she was a minister, and the First Amendment barred her claim as a result. *Id.* at 556–61. In doing so, it recognized that "[t]he relationship between an organized church and its ministers is its lifeblood" and "[m]atters touching this relationship must necessarily be recognized as of prime ecclesiastical concern." *Id.* at 558, 559. Deciding the minister's Title VII claim would intrude upon this sacred relationship, so the Fifth Circuit forbade it. *Id.* at 560–61.

In *Hosanna-Tabor*, the Supreme Court unanimously endorsed the ministerial exception. There, a teacher sued an Evangelical Lutheran school for unlawful retaliation under the ADA. *Hosanna-Tabor*, 565 U.S. at 177–79. The Court held that the teacher was a minister, so it barred her claim. *Id.* at 191–94. Recognizing the central importance of ministers to religious organizations, the Court concluded that allowing an employment discrimination suit against the school would contravene both the Free Exercise Clause ("which protects a religious group's right to shape its own faith and mission through its appointments") and the Establishment Clause ("which prohibits government involvement in such ecclesiastical decisions"). *Id.* at 188–89. For the Court, "[r]equiring a church to accept or retain an unwanted minister, or punishing a church for failing to do so, intrudes upon more than a mere employment decision." *Id.* at 188. This sort of civil intrusion "interferes with the internal governance of the church" by "depriving the church of control over the selection of those who will personify its beliefs." *Id.* The Court's decision was

the result of not only its past church autonomy jurisprudence, but also of what had long been held by the circuit courts: ecclesiastical independence in employment was of prime importance. *See id.* at 185–88. In the end, between the "interest of society in the enforcement of employment discrimination statutes" and "the interest of religious groups in choosing who will preach their beliefs, teach their faith, and carry out their mission," the Court held that "the First Amendment has struck the balance for us." *Id.* at 196.

*Our Lady of Guadalupe* recently reiterated *Hosanna-Tabor*'s holding. The Court in *Our Lady of Guadalupe* confronted the consolidated appeals of two Catholic school teachers who alleged discriminatory terminations in violation of the ADA and the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq.*, respectively. 140 S. Ct. at 2056–59. Because there existed "abundant record evidence that they both performed vital religious duties," the ministerial exception barred the employment discrimination suits of the two teachers. *Id.* at 2066. Although *Our Lady of Guadalupe* mainly concerned how to define ministerial status, the decision emphasized that "a church's independence on matters 'of faith and doctrine' requires the authority to select, supervise, and if necessary, remove a minister without interference by secular authorities." *Id.* at 2060 (quoting *Kedroff*, 344 U.S. at 116). This was because "[w]ithout that power, a wayward minister's preaching, teaching, and counseling could contradict the church's tenets and lead the congregation away from the faith." *Our Lady of Guadalupe*, 140 S. Ct. at 2060 (footnote omitted). Simply put, "[t]he ministerial exception was recognized to preserve a church's independent authority in such matters." *Id.* at 2060–61. *Hosanna-Tabor* first endorsed the

ministerial exception, and *Our Lady of Guadalupe* confirmed its strength.

From *Hosanna-Tabor* and *Our Lady of Guadalupe*, we take two principles. First, although these cases involved allegations of discrimination in termination, their rationale is not limited to that context. The protected interest of a religious organization in its ministers covers the entire employment relationship, including hiring, firing, and supervising in between. *See id.*; *Hosanna-Tabor*, 565 U.S. at 188, 194–96. Second, we cannot lose sight of the harms—civil intrusion and excessive entanglement—that the ministerial exception prevents. *See, e.g.*, *Our Lady of Guadalupe*, 140 S. Ct. at 2060–61, 2069; *Hosanna-Tabor*, 565 U.S. at 187–89. Especially in matters of ministerial employment, the First Amendment thus "gives special solicitude to the rights of religious organizations." *Hosanna-Tabor*, 565 U.S. at 189.

## B

With these precedents in mind, we consider Demkovich's hostile work environment claims. *Cf. Hosanna-Tabor*, 565 U.S. at 196 ("There will be time enough to address the applicability of the exception to other circumstances if and when they arise."). To succeed on a hostile work environment claim, a plaintiff must show: (1) unwelcome harassment; (2) based on a protected characteristic; (3) that was so severe or pervasive as to alter the conditions of employment and create a hostile or abusive working environment; and (4) a basis for employer liability. *Howard v. Cook Cnty. Sheriff's Off.*, 989 F.3d 587, 600 (7th Cir. 2021).[4] Demkovich proceeds under Title VII and the

---

[4] At times, this court has recited this test differently, "looking instead for evidence that the workplace was both subjectively and objectively

ADA. Under either Act, and no matter the alleged animus, the elements of a hostile work environment remain the same. *Ford v. Marion Cnty. Sheriff's Off.*, 942 F.3d 839, 856 (7th Cir. 2019) (the ADA); *EEOC v. Costco Wholesale Corp.*, 903 F.3d 618, 624–25 (7th Cir. 2018) (Title VII). For its part, the ministerial exception operates as an affirmative defense to employment discrimination claims, *Hosanna-Tabor*, 565 U.S. at 195 n.4, turning on the function of the employee and safeguarding all faiths. *See Our Lady of Guadalupe*, 140 S. Ct. at 2060, 2066–67.

A hostile work environment is based on the totality of the circumstances. Courts consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). This inquiry is "fact intensive." *Howard*, 989 F.3d at 604. For example, we account for "the specific circumstances of the working environment" as well as "the relationship between the harassing party and the harassed." *Robinson v. Sappington*, 351 F.3d 317, 330 (7th Cir. 2003). Finding a hostile work environment, then, "is not, and by its nature cannot be, a mathematically precise test." *Harris*, 510 U.S. at 22. But when proved, one thing is certain: "the work environment was so pervaded by discrimination that the terms and conditions of employment

---

offensive—either in lieu of the first prong—that the employee was subject to unwelcome harassment—or the third prong—whether the harassment was severe or pervasive enough to rise to the level of a hostile work environment." *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 900 (7th Cir. 2018). But "[i]n the end, we have concluded that the inquiry is the same." *Id.*

were altered." *Vance v. Ball State Univ.*, 570 U.S. 421, 427 (2013); *accord Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986).

### III

This case concerns what one minister, Reverend Dada, said to another, Demkovich. Adjudicating Demkovich's allegations of minister-on-minister harassment would not only undercut a religious organization's constitutionally protected relationship with its ministers, but also cause civil intrusion into, and excessive entanglement with, the religious sphere. Judicial involvement in this dispute would depart from *Hosanna-Tabor* and *Our Lady of Guadalupe* and threaten the independence of religious organizations "in a way that the First Amendment does not allow." *Our Lady of Guadalupe*, 140 S. Ct. at 2069.

### A

Demkovich's hostile work environment claims challenge a religious organization's independence in its ministerial relationships. A judgment against the church would legally recognize that it fostered a discriminatory employment atmosphere for one of its ministers. *See Harris*, 510 U.S. at 21–23. So the church, like any other employer, must have necessarily failed in supervision and control, either directly or indirectly. *See Johnson*, 892 F.3d at 904 ("[E]mployers are strictly liable for the discriminatory acts perpetrated by supervisors and they are liable for the discriminatory acts of others—coworkers, independent contractors, customers, inmates etc.—only if they are negligent either in discovering or remedying the harassment."). And if Demkovich succeeds in his suit, it means his ministerial work environment "was so

pervaded by discrimination that the terms and conditions of employment were altered." *Vance*, 570 U.S. at 427.

But *Hosanna-Tabor* and *Our Lady of Guadalupe* teach that ministerial employment is fundamentally distinct. As the Court emphasized in *Hosanna-Tabor*, "[t]he members of a religious group put their faith in the hands of their ministers." 565 U.S. at 188. A minister is the "chief instrument" for a religious organization "to fulfill its purpose." *McClure*, 460 F.2d at 559. Only through a minister does a religious organization speak in its own voice and spread its own message. *See Hosanna-Tabor*, 565 U.S. at 188. In precluding termination claims by ministers, *Hosanna-Tabor* and *Our Lady* of *Guadalupe* recognize that a minister's religious significance makes this employment relationship different than others, and deservedly so. *See Our Lady of Guadalupe*, 140 S. Ct. at 2055, 2060; *Hosanna-Tabor*, 565 U.S. at 195. Just as a religious organization "must be free to choose those who will guide it on its way," so too must those guides be free to decide how to lead a religious organization on that journey. *Hosanna-Tabor*, 565 U.S. at 196.

A minister's legal status recognizes that ministerial employment differs from nonreligious employment, or even from nonministerial employment within a religious organization. *See Robinson*, 351 F.3d at 330 (noting we consider "the specific circumstances of the working environment" as well as "the relationship between the harassing party and the harassed"). Take Demkovich for example. As music director, choir director, and organist for the church, Demkovich assisted in the celebration of Mass by priests, Reverend Dada included. His participation in the liturgy was the reason for his work. *See Our Lady of Guadalupe*, 140 S. Ct. at 2063–64;

*Hosanna-Tabor*, 565 U.S. at 191–92. No other employer, besides a religious one, could impose this type of work requirement upon Demkovich. The work environment of a minister thus differs from the work environment of any other employee. Because ministers and nonministers are different in kind, the First Amendment requires that their hostile work environment claims be treated differently.

Religion permeates the ministerial workplace in ways it does not in other workplaces. Ministers, by their religious position and responsibilities, produce their employment environment. From giving a rabbinic sermon on a Jewish holy day to leading a mosque in a call to prayer, ministers imbue a religious organization with spirituality. Given a minister's role in the religious organization's practice of the faith, allowing hostile work environment claims here "intrudes upon more than a mere employment decision." *Hosanna-Tabor*, 565 U.S. at 188. Put differently, analyzing a minister's hostile work environment claim based on another minister's conduct is not just a legal question but a religious one, too.

As personnel is policy, employees are environment. If "the relationship between an organized church and its minister is its lifeblood," then the relationship between its ministers is its backbone. *McClure*, 460 F.2d at 558. Interaction between ministers is critical to a religious organization and its mission. Demkovich's duties were liturgical by nature. How Demkovich's employment ended—with a dispute over religious doctrine—cements the religious character of their relationship. As the Court stated in *Our Lady of Guadalupe*: "The ministerial exception was recognized to preserve a church's independent authority in such matters." 140 S. Ct. at 2060–61. Reverend Dada's supervision of Demkovich is such a matter.

The contours of the ministerial relationship are best left to a religious organization, not a court. Within a religious organization, workplace conflict among ministers takes on a constitutionally protected character. *See id.* at 2060 (explaining that the First Amendment protects the autonomy of a religious organization "with respect to internal management decisions that are essential to the institution's central mission"). To render a legal judgment about Demkovich's work environment is to render a religious judgment about how ministers interact. *Cf. McCarthy v. Fuller*, 714 F.3d 971, 976 (7th Cir. 2013) ("Religious questions are to be answered by religious bodies."). According to the dissent, our holding condones harassment of a minister as necessary to supervise or control that minister. Post at 13, 19, 21. We disagree. Deciding where a minister's supervisory power over another minister ends and where employment discrimination law begins is not a line to be drawn in litigation, the point of the ministerial exception.

Precluding hostile work environment claims arising from minister-on-minister harassment also fits within the doctrinal framework of the ministerial exception. A religious organization's supervision of its ministers is as much a "component" of its autonomy as "is the selection of the individuals who play certain key roles." *Our Lady of Guadalupe*, 140 S. Ct. at 2060. It would be incongruous if the independence of religious organizations mattered only at the beginning (hiring) and the end (firing) of the ministerial relationship, and not in between (work environment). *See, e.g., id.* ("But it is instructive to consider why a church's independence on matters of faith and doctrine requires the authority to select, *supervise*, and if necessary, remove a minister without interference by secular authorities." (emphasis added) (internal quotation marks and footnote

omitted)); *Hosanna-Tabor*, 565 U.S. at 194–95 ("The exception instead ensures that the authority to select and *control* who will minister to the faithful—a matter strictly ecclesiastical— is the church's alone." (emphasis added) (internal quotation marks and footnote omitted)). In sum, segmenting the ministerial relationship runs counter to the teachings of *Hosanna-Tabor* and *Our Lady of Guadalupe*, from which we see no reason to depart.

For this same reason, we apply the ministerial exception in the way the Supreme Court has applied it. Just as a religious organization need not proffer a religious justification for termination claims, a religious organization need not do so for hostile work environment claims. *See Hosanna-Tabor*, 565 U.S. at 194 ("The purpose of the exception is not to safeguard a church's decision to fire a minister only when it is made for a religious reason."). The dissent contends that "neutral, secular principles of law" should apply here, as in "property, contract, tax, or tort" cases. Post at 17. But the Court has rejected a similar argument. In *Hosanna-Tabor*, the Court held that a "valid and neutral law of general applicability," *Employment Div., Dept. of Human Resources of Ore. v. Smith*, 494 U.S. 872, 879 (1990) (internal quotation marks omitted), did not foreclose recognition of the ministerial exception. *Hosanna-Tabor*, 565 U.S. at 190. "*Smith* involved government regulation of only outward physical acts," while the minister's termination in *Hosanna-Tabor* "concern[ed] government interference with an internal church decision that affects the faith and mission of the church itself." *Id.* The same is true for the ministerial work environment. Attempts to cabin *Hosanna-Tabor* and *Our Lady of Guadalupe* to tangible employment action claims likewise do not persuade. In those cases,

the Court made no distinction, explicit or implicit, between tangible or intangible employment actions, so neither do we.

## B

Adjudicating Demkovich's hostile work environment claims would also lead to impermissible intrusion into, and excessive entanglement with, the religious sphere. To do so would contravene the Religion Clauses in much the same way the termination claims did in *Hosanna-Tabor* and *Our Lady of Guadalupe*. By probing the ministerial work environment, the state—acting through a court—interferes with the Free Exercise Clause, "which protects a religious group's right to shape its own faith and mission." *Hosanna-Tabor*, 565 U.S. at 188. A religious organization shapes its faith and mission through its work environment just as much as "through its appointments." *Id.*; *see Our Lady of Guadalupe*, 140 S. Ct. at 2060. Allowing the state to regulate the ministerial work environment similarly runs afoul of the Establishment Clause, "which prohibits government involvement in such ecclesiastical decisions." *Hosanna-Tabor*, 565 U.S. at 189. How one minister interacts with another, and the employment environment that follows, is a religious, not judicial, prerogative. *See Our Lady of Guadalupe*, 140 S. Ct. at 2060–61; *Hosanna-Tabor*, 565 U.S. at 189. In complement rather than conflict, the Free Exercise Clause and the Establishment Clause therefore preclude Demkovich's hostile work environment claims.

Consider first the litany of Free Exercise Clause problems with hostile work environment claims by ministers. "[Q]uestions of church discipline and the composition of the church hierarchy are at the core of ecclesiastical concern." *Milivojevich*, 426 U.S. at 717. So to adjudicate Demkovich's allegations, which center on his relationship with his fellow

minister and supervisor Reverend Dada, is to necessarily intrude upon the religious realm. Even at its least invasive, a hostile work environment claim threatens to fundamentally alter the ministerial relationship and work environment. *See Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 336 (1987) ("Fear of potential liability might affect the way an organization carried out what it understood to be its religious mission."). Because a minister lies at the heart of a religious organization's work and workplace, deciding whether discrimination pervaded his employment impermissibly requires "intrusion into a religious thicket." *Milivojevich*, 426 U.S. at 719. "The First Amendment outlaws such intrusion." *Our Lady of Guadalupe*, 140 S. Ct. at 2060.

Hostile work environment claims interfere with a religious organization's internal governance, presenting another Free Exercise problem. As we have said, "civil authorities have no say over matters of religious governance." *Korte v. Sebelius*, 735 F.3d 654, 678 (7th Cir. 2013). This invitation to turn the spiritual into the secular raises the concern of chilling religious-based speech in the religious workplace. *See* Brief for First Amendment Professors as *Amici Curiae* 7–11. Turning to Demkovich's allegations, what one minister says in supervision of another could constitute stern counsel to some or tread into bigotry to others. How is a court to determine discipline from discrimination? Or advice from animus? *See Hosanna-Tabor*, 565 U.S. at 205 (Alito, J. concurring, joined by Kagan, J.) ("In order to probe the *real reason* for respondent's firing, a civil court—and perhaps a jury—would be required to make a judgment about church doctrine."). These questions and others like them cannot be answered without infringing upon a religious organization's rights. *See Hernandez v.*

No. 19-2142                                    19

*Comm'r*, 490 U.S. 680, 699 (1989) ("It is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds."). Shielded by the Free Exercise clause, ministers should have an eye toward liturgy, not litigation. *See Rayburn v. General Conf. of Seventh-Day Adventists*, 772 F.2d 1164, 1171 (4th Cir. 1985) ("There is the danger that churches, wary of EEOC or judicial review of their decisions, might make them with an eye to avoiding litigation or bureaucratic entanglement rather than upon the basis of their own personal and doctrinal assessments of who would best serve the pastoral needs of their members.").

The Establishment Clause problems with adjudicating Demkovich's hostile work environment claims are just as plain. "Entanglement must be 'excessive' before it runs afoul of the Establishment Clause," *Agostini v. Felton*, 521 U.S. 203, 233 (1997), and so "the government action must involve 'intrusive government participation in, supervision of, or inquiry into religious affairs.'" *Vision Church v. Vill. of Long Grove*, 468 F.3d 975, 995 (7th Cir. 2006) (quoting *United States v. Indianapolis Baptist Temple*, 224 F.3d 627, 631 (7th Cir. 2000)). So it is here. A hostile work environment claim based on the relationship between ministers "would enmesh the court in endless inquiries as to whether each discriminatory act was based in Church doctrine or simply secular animus." *Alicea-Hernandez v. Cath. Bishop of Chicago*, 320 F.3d 698, 703 (7th Cir. 2003). Discerning doctrine from discrimination is no task for a judge or jury. *See Minker v. Balt. Annual Conf. of United Methodist Church*, 894 F.2d 1354, 1357 (D.C. Cir. 1990) (noting, in a promotion claim, that "[w]e cannot imagine an area of inquiry less suited to a temporal court for decision; evaluation of the

'gifts and graces' of a minister must be left to ecclesiastical in-
stitutions").

And for good reason. "It is not to be supposed that the
judges of the civil courts can be as competent in the ecclesias-
tical law and religious faith of all these bodies as the ablest
men in each are in reference to their own." *Watson*, 80 U.S. at
729; *see also Memorial and Remonstrance Against Religious
Assessments*, in Selected Writings of James Madison 21, 24
(R. Ketcham ed. 2006) (stating the idea that a "Civil Magistrate
is a competent Judge of Religious truth" is "an arrogant pre-
tension" that has been "falsified"). To be sure, "[i]nteraction
between church and state is inevitable." *Agostini*, 521 U.S. at
233. But when a court adjudicates a minister's hostile work
environment claim based on the protected ministerial rela-
tionship, excessive entanglement results. *See Rayburn*, 772
F.2d at 1171 (explaining that "[b]ureaucratic suggestion in
employment decisions of a pastoral character, in contraven-
tion of a church's own perception of its needs and purposes,
would constitute unprecedented entanglement with religious
authority").

The Supreme Court has held far less than intruding upon
a minister's work environment to be impermissible under the
Establishment Clause. *Cf., e.g., Santa Fe Independent School
Dist. v. Doe*, 530 U.S. 290, 301–10 (2000) (holding excessive en-
tanglement when public school permitted students to say a
prayer before football games). A religious organization
should not be forced to choose between proffering a religious
justification or risking legal liability. *See Hosanna-Tabor*, 565
U.S. at 194–95. "In these sensitive areas, the state may no more
require a minimum basis in doctrinal reasoning than it may
supervise doctrinal content." *Rayburn*, 772 F.2d at 1169; *see*

*also Lee v. Sixth Mount Zion Baptist Church of Pittsburgh*, 903 F.3d 113, 121–22 (3d Cir. 2018) (noting same). Informed by the Establishment Clause, the ministerial exception affords religious organizations protection from that choice. *See Amos*, 483 U.S. at 336 ("[I]t is a significant burden on a religious organization to require it, on pain of substantial liability, to predict which of its activities a secular court will consider religious."). To hold otherwise "misses the point of the ministerial exception." *Hosanna-Tabor*, 565 U.S. at 194.

Under either Religion Clause, procedural and practical problems abound when probing a minister's work environment. True, religious organizations do not "enjoy a general immunity from secular laws." *Our Lady of Guadalupe*, 140 S. Ct. at 2060. The Supreme Court has noted that "[t]he Establishment Clause does not exempt religious organizations from such secular governmental activity as fire inspections and building and zoning regulations." *Tony & Susan Alamo Found. v. Sec'y of Lab.*, 471 U.S. 290, 305 (1985). For example, religious organizations are not exempt from compliance with the Fair Labor Standards Act. *Id.* at 306. And as far as we can tell, no court has held that the ministerial exception protects against criminal or personal tort liability. Nor do we. If a minister's allegations rise to those levels, they may be independently actionable, as the protection of the ministerial exception inures to the religious organizations, not to the individuals within them.

But like the Fourth Circuit, we worry about a "protracted legal process pitting church and state as adversaries." *Rayburn*, 772 F.2d at 1171. This case's history shows the prejudicial effects of incremental litigation: two motions to dismiss, two subsequent decisions and orders, the beginnings of

discovery, an interlocutory appeal, a panel opinion, and now en banc rehearing. To defend against Demkovich's claims without the ministerial exception, the church would likely have to rely on the affirmative defense described in *Burlington Industries, Inc. v. Ellerth*, which "comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." 524 U.S. 742, 765 (1998) (establishing the standard as proof by a preponderance of the evidence). Meeting this burden makes legally relevant "every step" that the church took (or failed to take) in internally responding to the alleged behavior of Reverend Dada, from the informal procedures of a church handbook to the ancient traditions of a canon tribunal. *Elvig v. Calvin Presbyterian Church*, 375 F.3d 951, 973 (9th Cir. 2004) (Trott, J., dissenting). These "rules, policies, and decisions which are unmistakably of ecclesiastical cognizance" are "not the federal courts' concern." *Natal v. Christian & Missionary All.*, 878 F.2d 1575, 1577 (1st Cir. 1989).

The ministerial exception's status as an affirmative defense makes some threshold inquiry necessary. *See Hosanna-Tabor*, 565 U.S. at 195 n.4. At the same time, discovery to determine who is a minister differs materially from discovery to determine how that minister was treated, especially because admissible evidence is only a subset of discoverable information. *See* Fed. R. Civ. P. 26(b)(1). Even more onerous would be the depositions of fellow ministers and the search for a subjective motive behind the alleged hostility. It is this subjectivity that differentiates hostile work environment claims from tort claims, which seldom probe for

discriminatory animus. Tort liability—unlike liability for
employment discrimination claims—generally does not arise
as a direct result of the protected ministerial relationship. And
nothing indicates that the offensive and derogatory
comments here bring about any claim other than for
employment discrimination. Analogies to tort law fail to
recognize that a hostile work environment claim brings the
entire ministerial relationship under invasive examination.
*See* Brief for The Ethics and Religious Liberty Commission of
the Southern Baptist Convention, et al., as *Amici Curiae* 7–8.
Taken together, these concerns are at least in part why we
must "stay out of employment disputes involving those
holding certain important positions with churches and other
religious institutions." *Our Lady of Guadalupe*, 140 S. Ct. at
2060.

Like the Religion Clauses, employment discrimination
statutes serve "undoubtedly important" societal interests.
*Hosanna-Tabor*, 565 U.S. at 196. Yet "the very process of in-
quiry" in weighing these competing interests "may impinge
on rights guaranteed by the Religion Clauses." *NLRB v. Cath.
Bishop of Chicago*, 440 U.S. 490, 502 (1979). When these interests
conflict, as here, the ministerial exception must prevail. *See,
e.g.*, *Young v. Northern Ill. Conf. of United Methodist Church*, 21
F.3d 184, 185 (7th Cir. 1994) ("In other words, in a direct clash
of 'highest order' interests, the interest in protecting the free
exercise of religion embodied in the First Amendment to the
Constitution prevails over the interest in ending discrimina-
tion embodied in Title VII."). The dissent asserts that a
balancing approach is best. Post at 14–19. But as the Court de-
clared in *Hosanna-Tabor*, "the First Amendment has struck the
balance for us." 565 U.S. at 196.

## C

Demkovich's case is not our first engagement with matters of ministerial employment. This court has consistently recognized the importance of the ministerial exception and the protection it offers. In *Young*, we applied the ministerial exception to a Title VII claim for denial of a promotion by a probationary minister. 21 F.3d at 187–88 (characterizing as "fruitless" the plaintiff's argument "that Title VII may be applied to decisions by churches affecting the employment of their clergy"). In *Tomic v. Catholic Diocese of Peoria*, we did the same for an ADEA termination suit by a music director and organist. 442 F.3d 1036, 1040–43 (7th Cir. 2006) (stating that "[a religious employer] would not be constrained in its dealings with [its ministers] by employment laws that would interfere with the church's internal management, including antidiscrimination laws" (collecting cases)), *abrogated in part on other grounds by Hosanna-Tabor*, 565 U.S. at 195 n.4. And in *Alicea-Hernandez*, we dismissed under the ministerial exception a communications manager's suit alleging, among other claims, Title VII retaliation. 720 F.3d at 700, 703–04 ("The 'ministerial exception' applies without regard to the type of claims being brought."). Notably, each of these applications of the ministerial exception came before the Supreme Court's holding in *Hosanna-Tabor*.

We continued to confirm the ministerial exception's strength after its unanimous endorsement in that case. In *Grussgott v. Milwaukee Jewish Day School, Inc.*, we applied the ministerial exception to an ADA termination claim by a teacher at Jewish day school. 882 F.3d 655, 657, 662 (7th Cir. 2018) (per curiam) (describing *Hosanna-Tabor* as "the Supreme Court adopt[ing] the 'ministerial exception' to employment

discrimination laws that the lower federal courts had been applying for years"). In *Sterlinski v. Catholic Bishop of Chicago*, we held the ministerial exception barred a Title VII claim for demotion and termination by another organist and music director. 934 F.3d 568, 569, 572 (7th Cir.) (noting that *Hosanna-Tabor* "holds that Title VII of the Civil Rights Act of 1964 does not apply to ministers"), *as amended on denial of reh'g and reh'g en banc* (Oct. 31, 2019). Although Demkovich's appeal is our first encounter with the ministerial exception since *Our Lady of Guadalupe*, this decision is the next station on this journey.

On a final note, we acknowledge the split in the circuits on whether the ministerial exception covers hostile work environment claims. The Tenth Circuit holds that it does. *Skrzypczak v. Roman Cath. Diocese of Tulsa*, 611 F.3d 1238, 1243–46 (10th Cir. 2010). The Ninth Circuit holds that it does not, at least as a categorical matter. *Compare Elvig*, 375 F.3d at 969, *and Bollard v. Cal. Province of the Soc'y of Jesus*, 196 F.3d 940, 945–50 (9th Cir. 1999), *with Werft v. Desert Sw. Annual Conf. of United Methodist Church*, 377 F.3d 1099, 1101–04 (9th Cir. 2004) (per curiam).[5] The church contends that the Eleventh and Fifth Circuits have also weighed in on this issue. But we are not sure the cases cited cleanly presented hostile work environment claims. *See Gellington v. Christian Methodist Episcopal Church*, 203 F.3d 1299, 1300–01 (11th Cir. 2000); *Combs v. Cent. Tex. Annual Conf. of United Methodist Church*, 173 F.3d 343, 350–51 (5th Cir. 1999). Regardless of the depth of the split, courts on either side recognized this court's position before Demkovich's suit. *See Skrzypczak*, 611 F.3d at 1245 ("[W]e

---

[5] The dissent places great emphasis on the Ninth Circuit's reasoning in *Elvig* and *Bollard*. We note that these cases predate the Supreme Court's decisions in *Our Lady of Guadalupe* and *Hosanna-Tabor*.

choose to follow the Seventh Circuit's decision in *Alicea-Hernandez v. Catholic Bishop of Chicago*, 320 F.3d 698 (7th Cir. 2003), which, in our opinion, is the better-reasoned approach."); *Elvig*, 375 F.3d at 960 n.4 ("The Seventh Circuit would perhaps sweep up Elvig's claim within its blanket statement that the 'ministerial exception' applies without regard to the type of claims being brought. *Alicea-Hernandez*, 320 F.3d at 703." (alteration, internal quotation marks, and parenthetical omitted)). In this decision, we remove any doubt as to where we stand.

## IV

The First Amendment ministerial exception protects a religious organization's employment relationship with its ministers, from hiring to firing and the supervising in between. Adjudicating a minister's hostile work environment claims based on interaction between ministers would undermine this constitutionally protected relationship. It would also result in civil intrusion upon, and excessive entanglement with, the religious realm, departing from the teachings of *Hosanna-Tabor* and *Our Lady of Guadalupe*. Therefore, the ministerial exception precludes Demkovich's hostile work environment claims against the church.

We REVERSE the district court's decision denying dismissal of Demkovich's disability-based hostile work environment claim, and we AFFIRM on different grounds its dismissal of his sex, sexual orientation, and marital status claims. The case is REMANDED with instructions to DISMISS the state and federal claims.

No. 19-2142                                                    27

HAMILTON, *Circuit Judge*, joined by ROVNER and WOOD, *Circuit Judges*, dissenting. The majority opinion decides a hard question but makes it look easy. The majority holds that the "ministerial exception" recognized in First Amendment doctrine bars any hostile environment employment claims by "ministerial employees." The majority tells us that the risks of unconstitutional intrusion and entanglement between civil courts and faith communities are just too great to allow any such lawsuit. This bar will apply regardless of how severe, pervasive, or hostile the work environment is, regardless of whether the hostility is motivated by race, sex, national origin, disability, or age, and regardless of whether the hostility is tied to religious faith and practice. I respectfully dissent.

The majority opinion makes the case look easy by scarcely acknowledging or engaging with the arguments on the other side. It also disregards the limits the Supreme Court imposed on its decision in *Hosanna-Tabor Evangelical Lutheran Church & School v. E.E.O.C.*, 565 U.S. 171 (2012), where the Court made clear it was deciding only that the ministerial exception applies to terminations of ministers. By focusing too much on religious liberty and too little on counterarguments and other interests, the majority opinion takes our circuit's law beyond necessary protection of religious liberty. It instead creates for religious institutions a constitutional shelter from generally applicable laws, at the expense of the rights of employees.

We should instead stick with the panel's more cautious approach to this relatively new and rare question. We should weigh competing interests case-by-case to protect both religious liberty and laws against employment discrimination.

To show why the hostile environment question is harder than the majority makes it appear and why the majority's

Case: 1:16-cv-11576 Document #: 117 Filed: 09/29/21 Page 28 of 49 PageID #:660
Case: 19-2142    Document: 00713854177    Filed: 08/02/2021    Pages: 49

sweeping holding is not justified, this opinion proceeds as fol-
lows. First, the Supreme Court has not decided the question
we face. Second, the circuits and state courts are already di-
vided on the question. Third, turning to the substance of the
question, given other similar claims that civil courts may hear,
the majority's holding draws an oddly arbitrary line as a mat-
ter of constitutional law, barring only hostile environment
claims. Fourth, the Ninth Circuit's and our panel's line be-
tween tangible employment actions and hostile environment
claims is the line most congruent with the purposes of the
ministerial exception. It allows churches ample power to se-
lect, control, and supervise their ministers while protecting
employees from abuses that are not properly within the scope
of anyone's employment. Next, the Ninth Circuit's and
panel's allowance of hostile environment claims, subject to a
narrower, case-by-case balancing approach toward First
Amendment issues, is more in harmony with the broader
sweep of First Amendment precedents—protecting religious
liberty while not granting special privileges to churches at the
expense of their employees except where necessary. Finally, it
is necessary to highlight the breadth of the majority's holding
and the consequences it may have.

1. **The Supreme Court has not decided this question.** By
taking broad quotations out of context, the majority opinion
gives the impression that the Supreme Court has already de-
cided the question in this case in *Hosanna-Tabor* and *Our Lady
of Guadalupe School v. Morrissey-Berru*, 140 S. Ct. 2049 (2020). It
has not, and it has taken pains to say it has not.

In *Hosanna-Tabor*, the Supreme Court first recognized the
ministerial exception that every circuit had recognized. The
plaintiff in that case was a ministerial employee (a "called"

teacher in a religious school) who had been fired to retaliate against her for trying to assert her rights under the Americans with Disabilities Act. The Supreme Court affirmed summary judgment for the employer.

*Hosanna-Tabor* said that the ministerial exception is not a statutory interpretation. It is an application of the First Amendment: "Requiring a church to accept or retain an unwanted minister, or punishing a church for failing to do so, intrudes upon more than a mere employment decision. Such action interferes with the internal governance of the church, depriving the church of control over the selection of those who will personify its beliefs." 565 U.S. at 188.

The majority errs by disregarding the limits the Supreme Court put on its decision. The Court was working against the backdrop of more than a century of precedents of church encounters with civil authority. The Court was therefore cautious in *Hosanna-Tabor*, saying that it was not deciding the question we face here, which is whether the ministerial exception applies to suits that do not result from the *firing* of a ministerial employee:

> The case before us is an employment discrimination suit brought on behalf of a minister, challenging her church's decision to fire her. Today we hold only that the ministerial exception bars such a suit. *We express no view on whether the exception bars other types of suits, including actions by employees alleging breach of contract or tortious conduct by their religious employers.*

565 U.S. at 196 (emphasis added). Because Demkovich's amended complaint addresses only his treatment by his supervisor while he was employed and does not challenge his firing or any other tangible employment action, it falls squarely into the area that *Hosanna-Tabor* expressly declined to reach.

The majority here also quotes references in *Our Lady of Guadalupe* to a church's "employment relationship" with its ministers. From these unqualified references, the majority seems to infer that *Our Lady of Guadalupe* drove past the guardrail in *Hosanna-Tabor* without actually saying so. That's a misreading of the opinion. *Hosanna-Tabor* recognized the ministerial exception for the first time in Supreme Court jurisprudence, but with the limits just noted. *Our Lady of Guadalupe* decided an apparent circuit split on how courts should decide who counts as a ministerial employee. The plaintiffs in the *Our Lady of Guadalupe* cases were teachers who had been fired from jobs with religious schools.

The question the Court actually decided was that both teachers counted as ministerial employees so that they could not challenge their firings under employment discrimination laws. 140 S. Ct. at 2055. The question we face here, whether the ministerial exception should extend to hostile environment claims, was neither presented nor decided. Also, we already know that the First Amendment does not bar civil courts from *all* aspects of a minister's employment relationship. It has long been clear that civil courts may award damages for breaches of employment contracts. *Jones v. Wolf*, 443 U.S. 595, 606 (1979) (neutral principles may be applied to the

"manner in which churches own property, hire employees, or purchase goods").[1]

**2. Circuits and state courts are split on the question before us.** The circuit split is a sign that the question before us is not as easy as the majority presents it. In applying the ministerial exception, the Ninth Circuit has drawn a line between tangible employment actions and hostile environment claims. In *Bollard v. California Province of the Society of Jesus*, 196 F.3d 940 (9th Cir. 1999), plaintiff had been training for the priesthood. He alleged that his superiors subjected him to sexual harassment so severe that he left the Jesuit order before taking vows as a priest. The district court dismissed under the then-emerging ministerial exception. *Id.* at 944.

The Ninth Circuit reversed, emphasizing that the case did not present any challenge to "the Jesuit order's choice of representative, a decision to which we would simply defer without further inquiry." *Id.* at 947. The Jesuits also did not defend the alleged harassment as motivated by religious faith; the Jesuits condemned it.

---

[1] Ministers' claims for breach of contract can present serious First Amendment issues, but they are not barred categorically from civil courts. They call for case-by-case consideration of whether the claim may be decided without intruding into doctrinal or ecclesiastical territory. For illustrations of this approach, see, e.g., *Petruska v. Gannon Univ.*, 462 F.3d 294, 310–12 (3d Cir. 2006), and *Minker v. Baltimore Annual Conf. of United Methodist Church*, 894 F.2d 1354, 1359–61 (D.C. Cir. 1990). For treatments after *Hosanna-Tabor*, see, e.g., *Gregorio v. Hoover*, 238 F. Supp. 3d 37, 48–49 (D.D.C. 2017); *Kirby v. Lexington Theological Seminary*, 426 S.W.3d 597, 615–21 (Ky. 2014); *Sumner v. Simpson Univ.*, 238 Cal. Rptr. 3d 207, 217–22 (Cal. App. 2018).

The Ninth Circuit found that the Free Exercise Clause did not require the courts to deny relief on the hostile environment claim:

> The Free Exercise Clause rationale for protecting a church's personnel decisions concerning its ministers is the necessity of allowing the church to choose its representatives using whatever criteria it deems relevant. That rationale does not apply here, for the Jesuits most certainly do not claim that allowing harassment to continue unrectified is a method of choosing their clergy. Because there is no protected-choice rationale at issue, we intrude no further on church autonomy in allowing this case to proceed than we do, for example, in allowing parishioners' civil suits against a church for the negligent supervision of ministers who have subjected them to inappropriate sexual behavior.

196 F.3d at 947–48. A "generalized and diffuse concern" about church autonomy, the court added, was not enough to require dismissal. *Id.* at 948.

*Bollard* went on to consider the problem of entanglement under the Establishment Clause. The court found there would be no need to evaluate religious doctrine or the "reasonableness" of Jesuit practices. *Id.* at 950. Finding there would be no greater entanglement than in other private civil suits against a church, the Ninth Circuit found no constitutional barrier to the sexual harassment claim that did not challenge any tangible employment action.

The Ninth Circuit followed that same course in *Elvig v. Calvin Presbyterian Church*, 375 F.3d 951 (9th Cir. 2004), and drew essentially the same line the panel drew here. The plaintiff was an ordained minister. She alleged that a senior minister sexually harassed her and, after she protested, retaliated against her. The district court dismissed. Following *Bollard*, the Ninth Circuit reversed in part. The plaintiff could not challenge any tangible employment decisions but could pursue her hostile environment claims, including damages for emotional distress and reputational harm. *Id.* at 953.[2]

The Tenth Circuit took a different approach, expressly disagreeing with *Bollard* and *Elvig* in *Skrzypczak v. Roman Catholic Diocese of Tulsa*, 611 F.3d 1238 (10th Cir. 2010), where the plaintiff was a ministerial employee and sued for sex discrimination, including both tangible employment actions and a sexually hostile environment. The Tenth Circuit affirmed dismissal of all claims, reasoning as the majority does here that even the hostile environment claim would pose too great a threat of entanglement with religious matters. *Id.* at 1245.

**3. The majority's rule draws an odd, arbitrary line in constitutional law.** The central thrust of the majority opinion

---

[2] For other cases allowing ministerial employees to pursue hostile environment claims, see *Dolquist v. Heartland Presbytery*, 342 F. Supp. 2d 996, 1007 (D. Kan. 2004); *Prince of Peace Lutheran Church v. Linklater*, 421 Md. 664, 689, 28 A.3d 1171, 1185 (2011); *McKelvey v. Pierce*, 173 N.J. 26, 55, 800 A.2d 840, 858 (2002); *Van Osdol v. Vogt*, 908 P.2d 1122, 1130 (Colo. 1996); *Black v. Snyder*, 471 N.W.2d 715, 720–21 (Minn. App. 1991). As for our decision in *Alicea-Hernandez v. Catholic Bishop of Chicago*, 320 F.3d 698 (7th Cir. 2003), which some have mistakenly read as rejecting all hostile environment claims by ministerial employees, see the panel's analysis of the case. *Demkovich v. St. Andrew the Apostle Parish, Calumet City*, 973 F.3d 718, 724–26 (7th Cir. 2020).

is that religious liberty will be undermined if churches are accountable in civil courts for what would otherwise be illegal discrimination against ministerial employees subjected to hostile work environments based on race, sex, disability, or national origin. To be clear, I agree that such cases raise serious concerns about protecting religious liberty, but defendants' cries of doom call for a little more skepticism. Churches and their leaders are already accountable in civil courts for many similar sorts of claims. Courts already navigate these waters with more attention to nuance and less reliance on absolute immunities. Religious liberty still thrives.

First, defendants and all members of this court agree that employment discrimination laws may be enforced against churches on behalf of *non*-ministerial employees. Those employees may assert rights against churches for discrimination in hiring, firing, compensation, and every other aspect of the employment relationship, including hostile environment claims.

Second, defendants and all members of this court agree that even ministerial employees may assert tort claims against supervising ministers and churches as institutions. On-the-job conduct that supports statutory claims for hostile environment discrimination may also amount to torts, including assault and battery (when abuse is physical) and intentional infliction of emotional distress.

Third, defendants and all members of this court agree that supervising ministers may be subject to criminal law for crimes committed against church employees, including ministerial employees.

Fourth, defendants and all members of this court agree that churches and their ministers are subject to civil law—including tort and criminal law—for wrongs committed against parishioners and others. For example, cases of ministers sexually abusing parishioners, especially children, have become too familiar.

In each of these types of cases, there is some risk of burdening religious liberty and entangling civil and religious affairs. But the First Amendment does not categorically defeat any of them. Consider, for example, parish priests who sexually abused children and were transferred to other parishes. Investigations into tort and criminal liability of supervisors and churches as institutions cannot avoid looking into a church's supervision and control of a ministerial employee. Delicate legal questions may arise, but such investigations, civil suits, and even prosecutions may proceed. No one here suggests that the First Amendment flatly prohibits the inquiries. Instead, if a special difficulty arises under the First Amendment, courts will deal with it.

In this case, however, the majority adopts a broad exception for any hostile environment claims by ministerial employees. That produces an oddly arbitrary line. I see no good reason why the careful, case-by-case approach to First Amendment issues is appropriate in these other categories of cases but is intolerable in this one.[3]

---

[3] The majority shrugs off the comparison to tort law with a surprising and unsupported assertion, that tort claims are not subjective and "seldom probe for discriminatory animus." Ante at 22. State of mind is at the heart of tort law. Consider the great divide between intentional torts and negligent torts. See Prosser & Keeton, The Law of Torts § 8 (5th ed. 1984) (citing "intent" as "the key distinction between two major divisions of

**4.  The line between tangible employment actions and hostile environments fits the purposes of the ministerial exception.** Defendants say this category of cases is special because of the central role of ministers and churches' need to be able to select and supervise them. That need lies at the heart of the ministerial exception, as the Supreme Court explained in *Hosanna-Tabor* and repeated in *Our Lady of Guadalupe*. See, e.g., 565 U.S. at 195; 140 S. Ct. at 2060. But the defendants' answer is too glib.

The First Amendment question has never been what sorts of legal immunities might *help* churches. As *Bollard* teaches, the question is whether this particular legal immunity "is *necessary* to comply with the First Amendment." 196 F.3d at 947. After all, we are talking here about imposing constitutional restrictions on Congressional power to protect employees from invidious discrimination based on race, sex, disability, or national origin. The government's interest in preventing such discrimination has long been recognized as "compelling" for purposes of constitutional analysis, e.g., *New York*

---

legal liability—negligence and intentional torts"). Even with non-intentional torts, state of mind is often critical in deciding about punitive damages or whether conduct has been reckless, wanton, or willful, for example. See Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 2, cmts. a & b (2010) (summarizing differences among and significance of these states of mind); Prosser & Keeton, § 2 ("Where the defendant's wrongdoing has been intentional and deliberate, and has the character of outrage frequently associated with crime," courts permit the award of punitive damages).

The majority also declares that tort liability generally does not arise as a direct result of the protected ministerial relationship. Ante at 22. With respect, I am skeptical, given the role that a priest's or other pastor's power may play in, for example, sexual abuse of parishioners or subordinate ministers, or in inflicting emotional distress on a subordinate.

*State Club Ass'n v. City of New York*, 487 U.S. 1, 14 n.5 (1988), and one that Congress considered a policy "of the highest priority." *Newman v. Piggie Park Enterprises, Inc.*, 390 U.S. 400, 402 & n.3 (1968), citing committee reports on what became the Civil Rights Act of 1964.

To answer whether this additional immunity from hostile environment claims is *necessary*, we should start with powers that are undisputed: the powers churches already have to select and control their ministers, free of constraints from employment discrimination and other laws. Hiring, firing, promoting, retiring, transferring—these are decisions that employers, including religious organizations, make to select those who carry out their work. The latent power to take such actions offers other tools for control. Further control is available through many other tangible employment actions, including decisions about compensation, benefits, working conditions, resources available to do the job, training, support from other staff and volunteers, and so on.

Employment discrimination law is built on the recognition that employers have these powers *to control their employees*. As the Supreme Court explained in *Ellerth*: "Tangible employment actions are the means by which the supervisor brings the official power of the enterprise to bear on subordinates" and require "an official act of the enterprise." *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 762 (1998). Control is the very point of those powers. As *Ellerth* explained, that's why employers are held accountable for these tangible decisions when managers make them with an unlawful purpose. *Id.*

Hostile environment claims, while they may arise under the same statutes, involve quite different elements and special

rules for employer liability. The differences show that religious employers do not *need* exemption from such claims to be able to select, supervise, or control their ministers.

Hostile environment claims, which are essentially tortious in nature, are by definition based on actions that are *not* necessary for effective supervision of employees. See *Ellerth*, 524 U.S. at 756–57; *Faragher v. City of Boca Raton*, 524 U.S. 775, 793–94 (1998). In general, "sexual harassment by a supervisor is not conduct within the scope of employment," so the employer cannot be held liable for that conduct. *Ellerth*, 524 U.S. at 757. However, "an employer can be liable, nonetheless, where its own negligence is a cause of the harassment," *id.* at 759, or where the supervisor takes tangible employment action against the employee. *Id.* at 760–61; accord, *Faragher*, 524 U.S. at 789–90. If no tangible employment action is taken, these rules treat harassment as a tort committed by a supervisor against an employee *but acting outside the scope of the supervisor's employment*.

Defendants here argue in effect that their power as employers to take tangible employment actions against ministerial employees does not give them enough power to select, supervise, and control those employees. But the Supreme Court's leading case on the subject teaches that a hostile work environment, by definition, simply is not a permissible means of exerting (constitutionally protected) "control" over employees and accomplishing the mission of the business or religious organization. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993). The conduct plaintiff alleges here is classic tortious harassment under *Harris*, *Ellerth*, *Faragher*, *Meritor Savings Bank FSB v. Vinson*, 477 U.S. 57, 65–66 (1986), and countless

No. 19-2142                                                              39

other cases in the lower courts: his supervisor allegedly sub-
jected him to a campaign of verbal abuse based on his sex,
sexual orientation, and disabilities, ultimately interfering
with his job performance and mental and physical health. Or
so we must assume here on the pleadings.[4]

An employer's need and right to control employees
should not embrace harassing behavior that the Supreme
Court has defined in numerous cases as conduct that "unrea-
sonably interferes with an employee's work performance."
*Harris*, 510 U.S. at 23. The notion that such harassment is
somehow necessary to control or supervise an employee is,
under employment discrimination law, an oxymoron.

The majority tells us, however, that hostile environment
claims by ministerial employees threaten religious liberty be-
cause they will cast a shadow over a supervisory minister's
"counseling" of a wayward subordinate. With respect, neither
defendants nor the majority have identified any cases actually
challenging counseling or good-faith supervision in the dec-
ades that such cases might have been brought. The suggestion
that federal courts cannot tell the difference between pastoral
counseling, even with "tough love" or "stern counseling" as
the majority puts it, and torrents of the most vile and abusive
epithets aimed at race, sex, sexual orientation, and disability
does not give sufficient credit to the federal courts. Courts
have been protecting religious liberty for generations by po-
licing lines far more subtle than the one that worries defend-
ants and the majority in this case.

---

[4] As this appeal comes to us, we must also assume that plaintiff would
be able to show a basis for employer liability, as the panel opinion noted.
*Demkovich*, 973 F.3d at 723.

**5.   The majority departs from a long practice of carefully balancing civil law and religious liberty.** Application of employment discrimination laws, including in hostile environment claims, poses *some* risk of "entanglement" between civil power and churches. See *Bollard*, 196 F.3d at 948–49; *Elvig*, 375 F.3d at 956–57. But that recognition should be only the beginning of the analysis, not the end. See generally *Agostini v. Felton*, 521 U.S. 203, 233 (1997) ("Interaction between church and state is inevitable, … . Entanglement must be 'excessive' before it runs afoul of the Establishment Clause."). Where faith communities encounter civil law, American courts have a long history of balancing the powerful interests on both sides to protect religious freedom while enforcing other important legal rights. The problem here is particularly sensitive, involving tension between the freedom of religion and employees' rights to be free from invidious discrimination.

The cases speak of both procedural and substantive entanglement. Defendants argue that both are inevitable here. Yet courts have relatively little experience with hostile environment claims by ministerial employees against religious employers. Perhaps defendants' predictions of intolerable abuses and intrusions may come true. Yet in more than twenty years, they have not in the Ninth Circuit. Until shown otherwise, I believe courts can manage a balance that respects the rights of both churches and their employees.

Procedural entanglement may result from "a protracted legal process pitting church and state as adversaries," in which the religious organization would be subjected to "the full panoply of legal process designed to probe the mind of the church," including "far-reaching" remedies and "continued court surveillance of the church's policies and

decisions" even after final judgment. *Rayburn v. General Conference of Seventh-Day Adventists*, 772 F.2d 1164, 1171 (4th Cir. 1985). Substantive entanglement occurs "where the Government is placed in a position of choosing among competing religious visions." *E.E.O.C. v. Catholic University of America*, 83 F.3d 455, 465 (D.C. Cir. 1996) (quotation marks omitted).

The potential for procedural entanglement does not justify a categorical rule against all hostile environment claims by ministerial employees. Religious employers have long been subject to employment discrimination suits by their non-ministerial employees. The processes of civil litigation can be intrusive, of course; no employer welcomes them. But civil litigation of such claims against religious employers has not been deemed a sufficient basis to require dismissal. Tort, contract, and property cases are not barred categorically. Procedural entanglement is not necessarily any more a concern with hostile environment claims by ministerial employees than with claims by non-ministerial employees. These cases are no more suitable for a one-size-fits-all prohibition.

On the subject of procedural entanglement, *Ohio Civil Rights Commission v. Dayton Christian Schools, Inc.*, 477 U.S. 619 (1986), weighs against the majority's broad rule. A state civil rights commission started to investigate allegations that a religious school discriminated against a teacher because of her sex. As in the later *Hosanna-Tabor* case, the teacher had agreed in her contract to resolve disputes within the church itself. The school ultimately fired her for complaining to the state government to start a civil investigation, contrary to this commitment. *Id.* at 623.

No. 19-2142

The school sought a federal injunction against the state investigation based on what we would now call entanglement, arguing "that any investigation of [the school's] hiring process or any imposition of sanctions for [its] nonrenewal or termination decisions would violate the Religion Clauses of the First Amendment." *Id.* at 624–25. The Supreme Court rejected the claim, holding that the district court should have abstained from exercising jurisdiction under *Younger v. Harris*, 401 U.S. 37 (1971), and its progeny. 477 U.S. at 625.

Noting that "[e]ven religious schools cannot claim to be wholly free from some state regulation," the Court had "no doubt that the elimination of prohibited sex discrimination is a sufficiently important state interest" to justify *Younger* abstention and also had "no reason to doubt that [the school] will receive an adequate opportunity to raise its constitutional claims" in state proceedings. *Id.* at 628. *Dayton Christian Schools* signals that an investigation of such an allegation of discrimination does not threaten unconstitutional entanglement to the extent that the investigation must be shut down before it begins.

That result is consistent with the broader landscape of litigation in civil courts involving churches. The Catholic Church has itself faced extensive litigation over torts committed by clergy in recent years. That litigation has inquired—sometimes deeply—into the relationships between clergy and parishioners and into the Church's supervision and disciplinary practices in dealing with priests suspected of having sexually abused children. The First Amendment does not bar such claims or the necessary investigations. See, e.g., *Martinelli v. Bridgeport Roman Catholic Diocesan Corp.*, 196 F.3d 409, 430–32 (2d Cir. 1999); *Malicki v. Doe*, 814 So. 2d 347, 351–

57 & n.2 (Fla. 2002) (collecting cases); see also *Elvig*, 375 F.3d at 959 (allowing minister's hostile work environment claim based on sexual harassment to go forward where allegations would require only "a purely secular inquiry" and would not require court to pass on issues of religious doctrine).

Accordingly, the potential for procedural entanglement should not bar plaintiff's claims here entirely. Courts can and should deal with procedural entanglement problems as they arise, not close the courthouse to the entire category of cases.

The more difficult problems arise here in terms of potential substantive entanglement. Again, though, we need to keep in mind that some entanglement is "inevitable" and that only "excessive" entanglement violates the First Amendment. *Agostini*, 521 U.S. at 233. Courts have managed potential entanglement problems in church litigation across a range of subjects, from contracts and property disputes to employment disputes, torts, and church elections and schisms.

The general parameters are familiar. Civil courts must not decide questions of correct faith and practice, such as deciding which of two rival groups seeking control of church property has the better theological or doctrinal arguments. At the same time, civil courts sometimes must decide questions of property, contract, tax, or tort law in cases involving churches. They may do so if they avoid issues of faith and stick to applying neutral, secular principles of law.

In some cases, that approach has led civil courts to leave churches alone. E.g., *N.L.R.B. v. Catholic Bishop of Chicago*, 440 U.S. 490, 503 (1979) (interpreting statute to deny NLRB jurisdiction over lay teachers in church schools); *Serbian Eastern Orthodox Diocese for the U.S.A. v. Milivojevich*, 426 U.S. 696,

708–09 (1976) (reversing state court decision that set aside decisions of "mother church" defrocking bishop, dividing diocese, and amending diocese constitutions); *Presbyterian Church in the U.S. v. Mary Elizabeth Blue Hull Memorial Presbyterian Church*, 393 U.S. 440, 449 (1969) (reversing state-court decision in property dispute that had been based on court's assessment of church doctrine); *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in North America*, 344 U.S. 94, 120–21 (1952) (striking down state statute transferring administrative control of church from Russian hierarchy to leader of United States branch). These are the cases that drive the majority's conclusions here.

In other cases, however, civil law may be applied to churches without intolerable burdens on religious liberty. E.g., *Hernandez v. Comm'r of Internal Revenue*, 490 U.S. 680, 695–700 (1989) (affirming denial of charitable deductions for "gifts" to church where quid pro quo exchange for services was clear); *Tony and Susan Alamo Foundation v. Sec'y of Labor*, 471 U.S. 290, 305 (1985) (permitting application of Fair Labor Standards Act to religious employer); *Bob Jones University v. United States*, 461 U.S. 574 (1983) (affirming denial of university's tax-exempt status based on racial discrimination said to be based on religious doctrine); *Wolf*, 443 U.S. at 602–04 (resolving property dispute between rival factions of local church based on neutral principles). In all of these cases there was some risk or degree of entanglement, but the Supreme Court deemed it tolerable. If we consider the full sweep of the case law, rather than just one side of it, we see a need for balance and nuance, not new absolute rules in constitutional law.

No. 19-2142                                                    45

In this case, plaintiff is not asking the court to pass on the substance of the Catholic Church's religious doctrines or practices. Civil courts have nothing to say about whether the Church should permit same-sex marriage, for example, or whether the Church should have a hierarchical supervisory structure. The Church was free to decide whether to retain plaintiff or fire him. But plaintiff's hostile work environment claims allege conduct that constituted abuse under neutral, generally applicable standards that would be enforceable on behalf of a non-ministerial employee. That conduct is, by definition, not necessary to control or supervise any employee. As in cases applying secular legal rules to torts, contracts, or property disputes, I would hold that courts may apply secular hostile-environment law to actions taken toward all employees, including ministers, absent a showing that the circumstances of the particular case will require excessive entanglement between civil and religious realms.

**6. Consequences and Stakes.** Finally, it is important to look past the abstractions about religious liberty and past the factual details of this case. We should consider the full range of facts that might prompt ministerial employees to bring hostile environment claims that the majority now bars.

We know that people who exercise authority within churches can be all too human. Casebooks and news reports tell us of cases of sexual harassment by ministers, sometimes directed at parishioners, sometimes at non-ministerial employees, and sometimes at other (typically less senior) ministers. *Elvig* is just one example. 375 F.3d at 953–54. See also the cases cited in footnote 2, above.

As noted in the panel majority, 973 F.3d at 730–31, within this circuit alone, hostile environment claims have been

brought against other types of employers on the basis of highly disturbing facts. E.g., *Gates v. Board of Education*, 916 F.3d 631, 637–39 (7th Cir. 2019) (plaintiff subjected to repeated use of vicious racial epithets; collecting a number of other cases in which racial and sex-based abuse constituted a hostile work environment); *Smith v. Rosebud Farm, Inc.*, 898 F.3d 747, 749–50 (7th Cir. 2018) (plaintiff subjected to four years of groping, mimed sex acts, and racial slurs; threatened with meat cleavers and had tires slashed after reporting workplace abuse to supervisor); *Porter v. Erie Foods Int'l, Inc.*, 576 F.3d 629, 635 (7th Cir. 2009) (Black employee repeatedly had noose left at his work station and suffered violent intimidation in the workplace); *Cerros v. Steel Technologies, Inc.*, 288 F.3d 1040, 1042–43 (7th Cir. 2002) (Latino plaintiff subjected to horrific racial harassment stemming from supervisors' explicit embrace of philosophy that "if it ain't white it ain't right"); *Brooms v. Regal Tube Co.*, 881 F.2d 412, 417 (7th Cir. 1989) (supervisor repeatedly showed racist pornography to employee, threatened to force her to engage in bestiality, and threatened to kill her); *Henderson v. Irving Materials, Inc.*, 329 F. Supp. 2d 1002, 1009–10 (S.D. Ind. 2004) (Black plaintiff terrorized by co-workers with tacit approval by supervisors).

In briefs and oral argument, defendants have acknowledged that a religious employer could be held civilly liable for a supervisor's criminal or tortious conduct toward a ministerial employee, or for the pattern of racial abuse and harassment described in *Porter*. Such cases would not violate the supervisor's or the employer's First Amendment rights. If criminal or tort cases do not, then it is hard to see why a statutory case based on the same conduct would *necessarily* violate the

No. 19-2142                                                    47

First Amendment, whether or not the supervisor claims a religious motive. See, e.g., *Elvig*, 375 F.3d 951; *Bollard*, 196 F.3d 940.

Given that the ministerial exception is driven by constitutional necessity, see *Hosanna-Tabor*, 565 U.S. at 188; *Bollard*, 196 F.3d at 947, it is difficult for me to conclude that the First Amendment requires immunity where supervisors and co-workers of ministerial employees, for example, leave nooses at the desk of a Black minister while repeatedly subjecting him to verbal abuse with racial epithets and symbols, or subject one teacher to pervasive and unwelcome sexual attention, or subject another to intimidating harassment based on national origin. Such harassment simply is not necessary to "control" ministerial (or any other) employees. We may all hope that such extreme allegations against religious organizations would be very rare. Yet the majority's holding today will put even this sort of extreme conduct beyond the reach of employment discrimination statutes.

From a practical standpoint, the majority's decision also raises the stakes for future decisions about who should be deemed a "ministerial" employee. Here we deal with alleged abuse of a music minister by a parish priest of the Catholic Church, two men surely at the core of the ministerial exception. Yet many employers with religious affiliations, such as hospitals and schools, are trying to expand the reach of the ministerial exception to cover a much broader range of their employees, such as teachers, nurses, and other health-care workers. *Hosanna-Tabor* and *Our Lady of Guadalupe* both involved schools and teachers, of course.

Lawyers for such employers have been offering public advice about how to try to expand the reach of the ministerial

exception as far as possible. One group advises, for example: "by distributing religious duties to as many staff members as is reasonably appropriate, a religious organization *can increase the perception that employees who have those duties are ministers*. Assigning employees responsibilities in prayer and devotions, including leading staff devotional studies, or responsibilities to provide congregational/member care, move those employees toward the 'minister' end of the spectrum." Donn C. Meindertsma, *Employment Law for Ministries*, Conner Winters (Mar. 2019), https://www.cwlaw.com/newsletters-40 (last visited July 8, 2021) (emphasis added). Another group advises that all employee agreements and handbooks state that the "organization's core mission includes the promotion, development, or education of religion," and that "Employees of the organization have a vital duty to aid in the promotion and development of the organization's core mission." Gordon Behr, *Hiring and Firing in Religious Organizations: The Ministerial Exception*, MauckBaker (Sept. 8, 2020), https://www.mauckbaker.com/post/hiring-and-firing-in-religious-organizations-the-ministerial-exception (last visited July 8, 2021).

Consistent with these efforts, in other cases religious employers have invoked the ministerial exception more broadly than seems reasonable. The following cases rejected such efforts, but the efforts show the hydraulic pressure being applied. *E.E.O.C. v. Pacific Press Publishing Assoc.*, 676 F.2d 1272, 1278 (9th Cir. 1982) (abrogated on other grounds) (editorial secretary at religious publishing company); *Goodman v. Archbishop Curley High Sch.*, 149 F. Supp. 3d 577, 586 n.5 (D. Md. 2016) (school librarian); *Herx v. Diocese of Ft. Wayne-South Bend*, 48 F. Supp. 3d 1168, 1177 (N.D. Ind. 2014) (language arts

teacher at Catholic school who did not lead religious observance and who was deemed a "lay teacher"), appeal dismissed, 772 F.3d 1085 (7th Cir. 2014); *Davis v. Baltimore Hebrew Congregation*, 985 F. Supp. 2d 701, 711 (D. Md. 2013) (facilities manager and janitor for synagogue); *Dias v. Archdiocese of Cincinnati*, 2012 WL 1068165, at *5 (S.D. Ohio Mar. 29, 2012) (computer teacher at Catholic high school who was not a Catholic and was barred from teaching Catholic doctrine). Also, of course, federal courts are familiar with cases of doctors sexually harassing nurses and principals sexually harassing teachers. The combination of the majority's holding in this case with efforts to expand the categories of employees deemed "ministerial" threatens to leave many without basic legal protection of their dignity and employment.

\*   \*   \*

The hostile environment claims before us present a conflict between two of the highest values in our society and legal system: religious liberty and non-discrimination in employment. The Supreme Court has not answered this question, nor does the First Amendment itself. Circuits and state courts are divided. For the reasons explained above and in the panel majority, I submit that the majority's absolute bar to statutory hostile environment claims by ministerial employees is not necessary to protect religious liberty or to serve the purposes of the ministerial exception. The majority's reasoning also stands in tension with the other categories of similar cases that may proceed in civil courts. I would allow plaintiff to pursue his hostile environment claims with the understanding that the district court should intervene if the specific case poses a serious threat to religious liberty.